James **PATTERSON** et al., Appellants,

v.

Billie Barbara **HALL** et vir, Appellees.

No. 11540.

Court of Civil Appeals of Texas.

Austin.

Feb. 26, 1969.

Rehearing Denied March 19, 1969.

Barkley, Cutcher & Alderson, James L. Cutcher, Taylor, Graves, Dougherty, Gee, Hearon, Moody & Garwood, Dan Moody, Jr., Austin, Bryan, Suhr, Bering & Bailey, James P. Bailey, Houston, for appellants.

Wallace T. Barber, San Marcos, Emmett Shelton, Sr., Sterling Holloway, John W. Stayton, Austin, for appellees.

HUGHES, Justice.

Billie Barbara Hall and husband, Nathan Hall, appellees, brought this suit against James Patterson, Frances Patterson Lee, a feme sole, Annie Mabry Gilliland and husband George W. Gilliland, Matie E. McKellar, a feme sole, Edith Butler and husband, W. S. Butler and the State Bank and Trust Company of San Marcos, Texas, Administrator of the Estate of Barbara L. Everett, deceased, to recover the title to and possession of 812.5 acres of land located in Hays County.

Trial to a jury resulted in a verdict and judgment for appellees. From this judgment, Matie E. McKellar, Frances Patterson Lee, Annie Mabry Gilliland, George W. Gilliland and Annie K. Patterson [1] have appealed.

This case is before us for the second time. See Patterson v. Hall, Tex.Civ.App., 421 S.W.2d 921, remanded to this Court by the Supreme Court, 430 S.W.2d 483. Upon re-

1. Annie K. Patterson answered and judgment was taken against her although she was not named in appellees' petition.

turn of the case to us, we granted appellants' motion for more time to file a statement of facts, and such statement of facts has been filed.

Trial was to a jury which answered the special issues submitted to it as follows:

"SPECIAL ISSUE NUMBER ONE: Do you find from a preponderance of the evidence that Barbara Everett made an oral gift to the Plaintiffs, Billie Barbara Hall and Nathan Hall, of the land described in the Plaintiffs' Original Petition and known as the 'Home place' at or about the time the Plaintiffs first moved on such lands in about 1962?

Answer: NO.

SPECIAL ISSUE NUMBER TWO: Do you find from a preponderance of the evidence that Barbara Everett made an oral gift to the Plaintiffs, Billie Barbara Hall and Nathan Hall, of the land described in the Plaintiffs' Original Petition and known as the 'Home place' during the year 1964?

Answer: YES.

SPECIAL ISSUE NUMBER THREE: Do you find from a preponderance of the evidence that the Plaintiffs, Billie Barbara Hall and Nathan Hall, entered into possession of such land relying on such gift, with the consent of Mrs. Everett?

Answer: YES.

SPECIAL ISSUE NUMBER FOUR: Do you find from a preponderance of the evidence that the Plaintiffs, Billie Barbara Hall and Nathan Hall, made valuable and permanent improvements on such land in reliance on the gift, with the knowledge and consent of Barbara Everett?

Answer: YES."

Appellants' first three points, jointly briefed, are that the finding of the jury to special issue number four is without any evidence to support it and is against the overwhelming weight and preponderance of the evidence so as to be clearly wrong.

Appellants' points four, five and six, briefed jointly, are that the jury answer to special issue number two was without any evidence to support it and was so against the overwhelming weight and preponderance of the evidence as to be clearly wrong.

We overrule these points. In so doing, we have considered the evidence under the rules prescribed in King v. King, 150 Tex. 662, 244 S.W.2d 660 (1952).

Mrs. Billie Barbara Hall, appellee, is a niece of Barbara L. Everett, a widow, who died intestate July 20, 1965. Mrs. Everett left no children. Surviving her were two sisters, Mrs. Matie McKellar and Mrs. Edith Butler, mother of Appellee, Mrs. Hall. Mrs. Everett was also survived by one nephew James Patterson, who died pendente lite, and two nieces Frances Patterson Lee and Annie Gilliland who were children of her deceased brother.

As indicated by the jury findings, Appellee Mrs. Hall claims the 812 acres in controversy by parol gift from Mrs. Everett.

Mrs. Everett owned a ranch of approximately 1500 acres, 800 acres of which she inherited from her parents and was known as the home place. It is this 800 acres which is in controversy.

Mrs. Everett was confined to a wheel chair. After the death of her husband in 1954 she had difficulty in obtaining help to run the ranch. She raised sheep, goats and cattle, and planted feed for the stock. The ranch became in poor condition. Fences and other improvements were in need of repairs.

During hurricane Carla in 1961 she lost more than 150 head of stock. The ranch was losing money; Mrs. Everett was so discouraged that she considered selling part of the ranch.

There is evidence that Billie Barbara was the favorite niece of Mrs. Everett and that

her other relatives paid little attention to her.

James DeRoy Howard who was a first cousin of Mrs. Everett's first husband was an income tax man and for many years he had prepared the returns for Mrs. Everett. Their relationship was very close.

Mr. Howard testified that Mrs. Everett told him that she would let Nathan and Billie Hall run the place and would give them 400 acres. She first mentioned giving them the home place but later said she would give them 400 acres. She stated that the place was losing money and that Nathan would get it back on a paying basis if he had an interest in it. In this connection, she asked Howard about gift and inheritance taxes. Mrs. Everett further told Howard that she was going to build appellees a house to live in. The witness saw the house being built and after it was completed Nathan and Billie moved onto the ranch in about October, 1962.

Later, Mrs. Everett told the witness that she had fixed it so Billie and Nathan would have 400 acres. One Sunday afternoon in 1963 or 1964, Mrs. Everett told Mrs. McKellar, one of the appellants, in the presence of Howard, that she, Mrs. Everett, had given Nathan and Billie 400 acres of the home place.

Howard testified further that under Mrs. Everett's agreement with appellees, Nathan was to receive $100.00 per month for traveling expenses that Mrs. Everett reported on her income tax returns as salary and appellees were to have one-third of the increase of the wool and mohair. But she never paid appellees the money received for their one-third of the increase but instead applied it on the indebtedness on the house that she had built for them. Mrs. Everett had borrowed the money to build the house. During the year 1964, she didn't take the depreciation on this house as a deduction on her income tax return because appellees were paying for the house and not Mrs. Everett. We quote her testimony in this respect:

"Q. Do you remember the specific time when you had this conversation with her?

A We talked about the income tax return?

Q Yes, sir.

A It was some time in February.

Q Of what year?

A 1965. I made her return in February.

Q Who initiated the talk with reference to taking the depreciation?

A I asked her about us taking it and she said we couldn't; that Nathan was paying for that house and we couldn't take the depreciation on it. It was not her house, it and the pipes to the house and all the water system."

On her 1963 return she showed this depreciation but it made no difference in the amount of tax she paid.

Mr. Howard testified that while he believed Mrs. Everett had made a gift of the land she had filed no gift tax return. On depositions taken prior to trial Mr. Howard had stated that no gift of the land was made by Mrs. Everett, but on the trial he testified that this testimony was in error.

Eva Navaries, who for five years lived on property adjoining the Everett ranch, testified that while the house was being built, Mrs. Everett told her it was the house she was giving appellees along with the home place.

In 1960 or 1961, Mrs. Everett listed the ranch with Jacob Bauerle, a real estate man, for sale. The ranch was not sold and a year or two later, Mrs. Everett told Bauerle that she did not wish to list the home place for sale because she was going to give it to her niece in South Texas, who would have to come to live with her to get it.

Vella Pettmacke, a school teacher, who lived on the property north of the Everett ranch from 1950 to 1955, testified that in

January or February, 1955, Mrs. Everett called her to tell her about her, Mrs. Everett's, difficulties in operating the ranch and to get the help of the witness in persuading appellees to move onto the ranch. Mrs. Everett told her that if appellees did so, the place would be theirs. There was no mention of the specific acreage that appellees would obtain.

The witness left Texas for Alaska in 1955 and returned to the Dripping Springs area on June 30, 1962. Upon her return she talked to Mrs. Everett every day for about a week. Mrs. Everett informed her that she, Mrs. Everett, was having a difficult time getting the ranch work done and that she hoped to persuade appellees to move onto the ranch. She stated that she intended to give appellees the place. This conversation was in June, 1962, and a house on the ranch was completed a few months later and appellees moved onto the ranch in October or November, 1962.

We quote the following testimony of Mrs. Pettmacke:

"Q When Billie first moved out, do you know whether or not you ever had any conversation with Mrs. Everett or anyone concerning the terms they moved out there on? Or did you ever have any conversation, that is, before they left?

A Before they left, no. But while they were gone, yes.

Q After they were gone, what conversations did you have with them?

A She said she was sorry that Billie and Nathan left but they will be back because the place is their's.

Q During the time—let's take after they came back—did you have occasion to talk to Mrs. Everett the last few years of her lifetime as to who the place belonged to? Did you have any such conversations about that?

A She came to see us and this was a very difficult undertaking for Mrs. Everett. Billie drove her.

She was assisted in some way in getting her into the automobile and Billie drove her over and she, I suppose, visited with us about two hours in the car. She was unable to leave the car, of course.

And when they left I told her to come back to see us. I wish she would come back more often. And she said, she would love to but it was troublesome for Billie and Nathan to get her in the car and so on. But I suppose it is not too much of an imposition. After all, the place is Billie's. * * *

She [Mrs. Everett] said, I am having a hard time getting my ranch work done and I hope to persuade Billie and Nathan to move out here with me. And I will certainly make it worth their time to move out here with me because I intend to give them the place."

Roy Lee Nix knew the Everetts and appellees when he had a stock farm near Dripping Springs. After Mr. Everett died, Mrs. Everett told the witness that she would have to get somebody to move on the place and would make arrangements to give the place to her namesake, Billie Barbara. The witness replied that two families should not live in one house and Mrs. Everett rejoined that she would build a house. Later, but before 1964, Mrs. Everett told the witness that she had given the place to Billie and hoped that they could make a go of the ranch.

Victor Fullman who lives at Dripping Springs testified that Mrs. Everett told him she was going to build a house for appellees to get them to help her out with the ranch and that she wanted to give them part of the place. This was before appellees moved onto the ranch.

James Ferrell, who did electrical work for Mrs. Everett, testified that Mrs. Everett told him that she had built the house and was giving it to appellees because they were going to take care of her for the rest of her life. She mentioned several hundred acres

as being what appellees would be given. This was in September, 1962.

Raymond Whisenant, who drilled water wells and hauled livestock for Mrs. Everett, testified that upon one occasion he took an invoice to Mrs. Everett's house and she said, "I am giving Billie Barbara and Nathan the homeplace and Billie Barbara and Nathan are going to take care of me to my death." This conversation occurred shortly before appellees first moved onto the ranch. A little later the witness took another invoice to Mrs. Everett and she informed him that "she had went ahead and given it to them. And they were moving out there."

Mrs. Dollie Bonham, whose ranch adjoined the Everett ranch on the north, testified that after appellees moved onto the ranch the witness was visiting with Mrs. Everett who stated that she had built a house for appellees and that "she had given them this house and eight hundred acres." Just when this conversation occurred is not clear.

Uncus Hensley, who did some work on the ranch after Mr. Everett died, testified Mrs. Everett told him that she thought she would give appellees the place if they would come out and take care of it. Later, Mrs. Everett told him she would give them all the ranch and the witness' reply was that that would not be fair.

Howell F. Pettmacke, husband of the witness Vella Pettmacke, whose ranch adjoins the Everett ranch on the north, testified that when he came back from Alaska, he asked Mrs. Everett what the carpenters were doing on the ranch and she replied she was building a house for appellees to come out and live in. She stated that she had given appellees the place to come and help her look after it. According to the witness "She did give the place to Billie and Nathan to come there to stay."

The witness, Milton Stanley Hall, no kin to Nathan, had hunted on the Everett ranch. He testified that Mrs. Everett told him she had partially raised Billie and when she, Mrs. Everett, died, she would see to it that Billie was taken care of. In a later conversation, Mrs. Everett stated that she was fixing a place for Billie and was giving appellees the home place.

The witness, Roy Breed, had known Mrs. Everett all his life. His testimony was that six years before the trial, Mrs. Everett had informed him that she was going to give her place to Billie, and that two years later, about 1962, she informed him "I have given my place to Billie Barbara" who "is the only one that has done anything for me."

The witness, John Hamilton Durst, manager of the Federal Land Bank Association of San Marcos, testified that when Mrs. Everett borrowed $6900.00 from the bank, she informed him she wanted the money to build a home for her niece and her niece's husband close by to take care of her, Mrs. Everett, "a cripple."

The witness, Georgia Caddell, who helped take care of Mrs. Everett after the death of Mr. Everett, testified that when Mrs. Everett was building the house on the ranch she informed the witness that she was going to give the home place to appellees if they came out there.

The witness, Effie Lyle, of Dripping Springs, testified that Mrs. Everett told the witness that she, Mrs. Everett, wanted Billie to have the home place before her, Mrs. Everett's, death.

The witness, W. S. Butler, whose wife is a sister of Mrs. Everett, and mother of Billie, testified that Mrs. Everett wanted to give Billie a decent place to live in before she died.

Appellees left the ranch and moved to town on March 6, 1964. They moved back to the ranch about three months later in the first part of June, 1964.

The period appellees were away from the ranch, Mrs. Everett listed it for sale with the real estate firm of Harrison, Wilson & Pearson.

The witness Howard testified that appellees and Mrs. Everett had a misunderstanding; that Mrs. Everett told him that appellees wanted the 800 acres instead of the 400 acres originally given them and that appellees had left the ranch.

Victor Fullman testified that appellees moved off the ranch because Mrs. Everett told them she was going to will the land to appellees' youngest child, a baby girl named Barbara.

Mr. Howard testified that after appellees left the ranch, Mrs. Everett attempted to operate it with the aid of one Hubak, who was unsatisfactory. Accordingly, Mrs. Everett decided "to go ahead and give them [appellees] the eight hundred acres" and that after appellees returned to the ranch, Mrs. Everett stated that "I have fixed it where Nathan and Billie will get the eight hundred acres."

To induce appellees to return to the ranch, Mrs. Everett wrote a letter to Billie in which Mrs. Everett stated to Billie that she was giving her the home place if Billie would return and take care of Mrs. Everett. The letter was delivered to Billie by Georgia Caddell who took care of Mrs. Everett. While this letter has been lost, its existence and contents are proven by the witnesses Effie Lyle, Leland Lyle and Nathan Hall.

While the witness Milton Stanley Hall had not read the letter, he testified that after appellees left, he told Mrs. Everett she had been working Nathan too hard and she replied that "He has been very damn well paid. I am giving him the place and I am giving him a percentage." This witness further testified that Mrs. Everett told him "I am going to write him a letter and I want him to come back up here," and that "she did write him a letter."

Further, the witness Effie Lyle testified that during the time appellees were away from the ranch, the witness accompanied Billie to Mrs. Everett's place and Mrs. Everett stated she wanted appellees to return to the ranch and she would make it right with them.

The witness Georgia Caddell testified that while appellees were away from the ranch Mrs. Everett stated that she wanted them back to do the work; that she couldn't get any help; and that she would give the eight hundred acres to appellees if they moved back.

The testimony further shows that in 1962, Nathan Hall worked full time as a clerk for an H.E.B. store in Austin for $72.00 per week. He and Billie owned their home in Austin. He and Billie moved to the ranch in September or October, 1962, and lived there until March, 1964. They sold their Austin home. Beginning in March, 1963, and until March, 1964, at Nathan's request, he worked only three days per week for H.E.B. During the three months' period he and Billie were away from the ranch, he worked full time for H.E.B. from 8 a. m. to 5 p. m. After he returned to the ranch he worked from noon until 9 p. m., these being the hours requested by him.

It is 54 miles round trip from the H.E.B. store to the ranch. Upon the basis of car expense of eight cents per mile, his round trips between the H.E.B. store and the ranch cost Nathan $85.00 per month. Mrs. Everett allowed him $100.00 per month to reimburse him for his transportation expense.

When appellees first went on the ranch in September, 1962, the fences were in poor condition. Those on the north and east would not turn stock. The east fence separated the home place from the public road. The north fence was about 1½ miles in length and the east fence about the same length. The south fence was in fair condition and the west fence would turn livestock.

In October, 1962, one of the goat sheds on the ranch was in good condition and the other in poor condition. One shed had no roof and was surrounded by no fence; the other was surrounded by a poor fence.

The fences and the goat sheds are now in good condition.

During the year 1963, the total income from the ranch operations was $5,273.67 and in 1964, the total income was $6,361.62, an increase of about 20%. Slightly fewer sheep were sheared in 1964 than in 1963 because one hundred head were sold prior to the 1964 shearing period. The clip during the first half of 1965 brought $2,101.98 as compared to $3,484.28 for the whole year of 1963 and $2,937.35 for the entire year of 1964.

Prior to the years 1963 and 1964, the period during which Nathan operated the ranch, the ranch lost money.

After appellees moved onto the ranch, Nathan did all the ranch work, including the repairing and rebuilding of fences, rounding up cattle, shearing the animals, gardening, the cutting of brush, the cutting of dead timber and the repairing of sheds. To build one of the ranch fences along a boundary line or to rebuild one in bad condition would cost from $900.00 to $1200.00 in labor alone.

Nathan purchased building materials from Milton Stanley Hall to repair the corrals and for other purposes.

Appellees also made payments on the loan Mrs. Everett made to build the house in which appellees lived. These payments came from their share of the wool and mohair money. The note was in the amount of $6,900.00 and was payable in semi-annual installments of $223.20 each. Such payments were made by Mrs. Everett on September 21, 1962, March 5, 1963, August 30, 1963, March 5, 1964, September 8, 1964, and March 15, 1965. The last two payments were made after appellees returned to the ranch after leaving it during the three months' period from March to June, 1964.

Considering the application of appellees' share of the wool and mohair money to the loan on the house, Mr. Howard testi-fied to his conversations with Mrs. Everett as follows:

"Q Going back to your 1963 return, you prepared that for her and she signed it. Is that right?

A That is right.

Q Does it show what she made in the way of income on her farm?

A On her farm?

Q On her ranch?

A Yes, sir.

Q Does it show her having paid out anything to Mr. Hall for his one-third interest?

A No, sir.

Q (By Mr. Shelton) Did you have any conversation with her about what his contract with her was?

A The thing was that he was to get a third of the profit of the wool and mohair.

Q Now, the question is: Do you know whether he got that or not?

A No, sir. That was to go on the payment of the house that he was living in that she had built for him.

Q Do you know how it was applied? From the records, can you tell me how it was applied?

A His part of the profit of the wool and mohair went into the payment on the place. And this wouldn't show the amount of the payment that she paid but she told me that that was the way it was applied to it."

During the period from October, 1962, when appellees first moved on the ranch, until Mrs. Everett's death in July, 1965, Mrs. Everett paid on the house loan, principal and interest, $1,090.55. Appellees' share of the wool and mohair money for the year 1964 was $979.12.

The unpaid portion of this loan has been adjudicated herein as a charge against the land awarded appellees.

The only witnesses who testified for appellants were Edwin I. McKellar, Jr., the lawyer son of one of the appellants, Attorney Tom Oliver, and the County Judge, Max Smith.

Mr. McKellar testified that after Mrs. Everett's funeral, he talked to appellees and they were confused; that there was discussion of appellees moving off the ranch; that Nathan informed him that Billie was in a bad shape and was going to leave unless appellees could get some land; that appellees made no claim to any land but claimed an interest in the cattle and the wool but were uncertain as to what their interest was; and that he first knew of appellees' claim to the land at the time appellees' suit was filed.

Mr. Tom Oliver testified that Will Butler and Nathan came to his office and wanted him to draw papers to protect appellees. According to the witness, the visit was a casual thing and he did not know whether they were talking about one acre or 500 acres. The witness informed them that he was sure Mrs. Everett would want to reserve a life estate and that the problem might be handled either through the use of a contract or the making of a will. According to the witness, appellees did not assert "a verbal gift" of the land but claimed an interest therein. Appellees expected to find a will.

Mr. Oliver also testified and his testimony was corroborated by the testimony of Max Smith, the County Judge, that Mr. Oliver prepared the application that was presented by the administrator to the Court to pay appellees for their part of the cattle and wool and mohair. There was nothing in the application about any claim of appellees to the land. The order allowing the payments to appellees was read out and there were no objections by Will Butler or by Nathan, who were present.

It is undisputed that the ranch was rendered for taxes as containing 1528 acres and that it was always rendered in the name of Mrs. Everett. Nathan so rendered it on October 31, 1963, for the 1964 taxes.

There is no direct testimony offsetting the statements attributed to Mrs. Everett of her intention to give and that she had given the home place to Billie Barbara. There are circumstances, some in addition to those above stated, which appellants rely on to establish the fact that there was no gift. These circumstances are: Mrs. Everett continued to live on the ranch until her death, took part in its operation, and paid by her check loan installments. Nathan Hall was paid $100.00 per month as "salary" while he worked on the ranch which was the same pay received by Uncus Hensley when he was employed by Mrs. Everett. This "salary" to Nathan Hall was so reported by Mrs. Everett for income tax purposes, and she paid Social Security taxes on it. Mrs. Everett built a house for the Halls to live in whereas Uncus Hensley lived in one room with a cement floor while he worked on the ranch. Many of the repairs and much of the fence building was done by Nathan Hall in 1962, before the alleged gift in 1964. Mrs. Everett knew a gift tax would be due if a gift of the land was made, yet she filed no gift tax return. She advertised the ranch for sale in May, 1964, and inquired about prospects of sale for two or three months thereafter.

As shown by its verdict, the jury found no gift in 1962, but that there was a gift in 1964. This may seem strange because if the testimony is separated as to each year the testimony supporting a gift in 1962 is much stronger than for a gift in 1964. The jury, no doubt, was influenced by the three month hiatus when the Halls moved from the ranch. To them it probably meant a repudiation of the gift by either or both parties.

Appellants take the position that the evidence shows, at most, a promise to give rather than a gift in praesenti, and that a promise to give is insufficient.

We believe that this question is settled by the decision in Wootters v. Hale, 83 Tex. 563, 19 S.W. 134 (1892). In that case the defendant claimed land under a parol gift from his father, that "In August or September, 1881, which was after the termination of the Kerchoffer heirs' suit, his father told him that because of the work he had done on the land and the $600 he had paid his brother, he thought defendant ought to have it; that he wanted him to have it, and, if he would move back on the place, he would give it to him, and went with him in company with L. H. Beard to select a building site thereon. Defendant consented, and they went to the place, and his father pointed out a good site, and asked defendant to build there." Thereafter the defendant made improvements on the place and moved on it in 1881. We quote further from the opinion of the Court:

"Upon the above state of facts the court charged the jury, in effect, that if they believed from the evidence that about the month of September, 1881, Robert Hale made a gift to his son W. T. Hale of the land here claimed by him, and that his son accepted said gift, and on the faith of same took possession and moved his family on same, and, relying on the gift so made to him, made permanent and valuable improvements, then you will find for the defendant, W. T. Hale.

A parol gift of land will be sustained and enforced when clearly proven, and when possession has been taken and valuable improvements made on the faith of it. Murphy v. Stell, 43 Tex. 123, 133; Willis v. Matthews, 46 Tex. 478, 482; Wooldridge v. Hancock, 70 Tex. 18, 21, 6 S.W. 818.

If the testimony of the defendant and the witness Beard was true—and the jury have determined that in favor of the defendant—a gift of the land in 1881 by Robert Hale to the defendant was clearly established. There can be no doubt about the terms of the gift; they were that, if the defendant would return to the land, and live upon it, his father would give it to him. Whatever may be thought about the defendant's failure on the former trial to mention in the testimony then given by him the gift which he claims was made to him in the year 1881, it only went to his credibility; and on the last trial he testified clearly and positively to his moving off the land in 1878 on account of the suit then pending for it, and that afterward, in 1881, his father told him he ought to have the land, and that, if he would move back upon it he would give it to him, and promised to make him a deed for it; that he did move back upon the land and cleared about 20 acres more of it and made other valuable improvements. He gave a reasonable explanation of his leaving the land in 1878, and of his disclaimer in the suit brought by the Kerchoffer heirs; and his testimony as to the gift, possession, and improvements was corroborated by the witness Beard. There is no doubt or obscurity about the nature and terms of the gift and the occupation and improvement of the land, left by the testimony, when its credibility is once established by the verdict of the jury. We think that the evidence authorized the charge, and that it is sufficient to support the verdict."

See 17 Tex.Law Rev., p. 491, Samuelson v. Bridges, 6 Tex.Civ.App. 425, 25 S.W. 636, San Antonio (1894) n. w. h., Houston Oil Company of Texas v. Payne, 164 S.W. 886, Tex.Civ.App., Galveston (1914) writ ref., Ryan v. Lofton, 190 S.W. 752, Tex. Civ.App., Fort Worth (1916) writ dismissed and Dean v. Dean, 226 S.W. 492, Tex.Civ. App., Texarkana (1921) n. w. h.

The decision in Miller v. Guinn, 120 S.W. 2d 474, Tex.Civ.App., El Passo, writ granted and later dismissed by agreement, is inconsistent with our decision here. Among other grounds, the writ was sought because of conflict with Wootters, supra. Also, there are other cases containing statements to the effect a parol gift to be valid

must be a present gift.[2] We do not discuss or try to distinguish all of these cases because we believe Wootters is decisive insofar as this Court is concerned. We are satisfied that Wootters is in accord with sound principles of equity in that it prevents fraud.

■ The evidence in this case is overwhelming and, mostly, from unimpeachable sources that Mrs. Everett was in desperate need of help in running the ranch, that her niece Billie was her favorite kinfolk, that Nathan operated the ranch, was a hard worker, and that Mrs. Everett promised Billie, in 1962 and in 1964, the home place if she and Nathan would move into the house which she built for them and operate the ranch until she died. Relying on these promises, the Halls sold their home in Austin, moved to the ranch and Nathan rearranged his working hours with H. E. B. and commuted 54 miles a day in order that he could manage and improve the ranch for Mrs. Everett. This he did by putting in long hours of hard labor. The Halls were successful in their efforts in making the ranch a paying business. Mrs. Everett enjoyed the benefits of these efforts until she died. It is our opinion that the proof of the gift of the home place to Billie Hall, as found by the jury, is sustained by full, clear and satisfactory evidence.

We turn our attention now to determine whether permanent and valuable improvements were made by the Halls on the ranch in reliance on the gift and with the knowledge and consent of Mrs. Everett.

In Davis v. Douglas, 15 S.W.2d 232, Tex. Comm. of App., (1929), the Court held that $30.00 in permanent improvements on a lot valued at $800.00 was sufficient to sustain a parol gift of the lot. The rule stated there was that permanent improvements of such value when compared with the value of the land as to enhance the value of the property to a substantial degree sufficed, but that improvements of an insignificant value would not avail. See also, Texas Practice, Vol. 4 "Land Titles and Title Examination" by Fred Lange, Sec. 423, p. 265–266.

The testimony shows that Nathan Hall labored to better the ranch and repair its improvements such as fences and sheds. He did this work for about sixteen months before leaving in March, 1964 and for about twelve months after returning to the ranch and prior to the death of Mrs. Everett. Also, it is shown that from his portion of the wool and mohair money Mrs. Everett paid about $500.00 on the house debt after the return of the Halls to the ranch. Appellees acquiesced in this payment.

The total amount paid by Mrs. Everett on the house note was, principal and interest, $1,090.55. Appellees' share of the wool and mohair money for the year 1964 was $979.12. It thus appears that most, if not all, of the payments made on the house came from appellees' funds. It is not necessary that appellees must have themselves built the house in order for them to constitute permanent and valuable improvements. Their payment for such improvements was sufficient. Byers v. Parker, 16 S.W.2d 1110, Tex.Civ.App., Amarillo, (1929) writ ref.

The value of the labor which Mr. Hall expended in the building or repairing the fences on the ranch from the time he first went there in 1962 is shown to be about $2,000.00.

We have concluded that all of the permanent and valuable improvements made by the Halls on the ranch from 1962 to the death of Mrs. Everett in July, 1965 should be considered to determine whether this gift is excepted from the statute of frauds.

■ It is our view, gleaned from the entire record, that there was but one gift transaction between Mrs. Everett and the

2. Appellants cite these cases: Murphy v. Stell, 43 Tex. 123 (1875); Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 15 A.L.R. 216 (1921); Wilson v. McLemore, 242 S.W.2d 791, Tex.Civ. App., Dallas (1951) writ ref. n. r. e.

Halls. This gift originated in 1962 and was confirmed in 1964. There was no alteration in the terms of the gift between such times although it may be discerned from the record that Mrs. Everett attempted to do so. The Halls left the ranch for a three month period during which this misunderstanding was apparently settled because upon being importuned by Mrs. Everett the Halls returned to the ranch upon the same terms upon which they went there to live in 1962. This, in our judgment, constituted a reinstatement of the original promise, or a renewal of it.[3] It would be manifestly unjust to hold that appellees have lost the benefit of permanent and valuable improvements made by them on the ranch prior to 1964, in reliance upon the promises made to them in 1962 and repeated in 1964.

■ We do not consider these permanent improvements to be of an insignificant, unimportant or trivial value when compared with the value of the home place, even though its value be in the neighborhood of $80,000.00.

Appellants' points seven through twelve, jointly briefed, in substance, are that the trial court erred in failing to submit to the jury their requested instructions 1, 2, 3, 4, and 5, and the cumulative effect of such failures caused the rendition of an improper verdict and judgment. We copy appellants' requested instructions:

"DEFENDANTS' REQUESTED INSTRUCTION NUMBER ONE: In connection with Special Issues Numbers 1 and 2, you are instructed that to establish an oral gift of land there must have been a present gift. To constitute a present gift, there must have been an intent on the part of Barbara Everett to convey the property in question at the time she made the gift, if she made a gift. A promise to convey land in the

future or to make a gift in the future, or to leave property in a will is not sufficient positive action to constitute a present gift.

DEFENDANTS' REQUESTED INSTRUCTION NUMBER TWO: In connection with Special Issue Number 3, you are instructed that the word 'possession' as used therein does not necessarily mean exclusive possession, but can mean the joint possession of Plaintiffs with Barbara Everett, however, it must be such possession in Nathan and Billie Hall that they would have the right of control which pertains to the status of an owner, and not the status of an employee.

DEFENDANTS' REQUESTED INSTRUCTION NUMBER THREE: In connection with Special Issue Number Four, you are instructed that the term 'valuable and permanent improvements' as used therein means the improvements made must be of a permanent nature, and of such value, in comparison with the nature and value of the property upon which the improvements are made, as to enhance the value of such property to a substantial degree. Improvements of an insignificant value are not sufficient.

DEFENDANTS' REQUESTED INSTRUCTION NUMBER FOUR: In connection with Special Issue Number Three, you are instructed that the word 'possession' as used therein does not necessarily mean exclusive possession, but can mean the joint possession of Plaintiffs with Barbara Everett, however, it must be such possession in Nathan and Billie Hall that they would have the right of control which pertains to the status of an owner.

DEFENDANTS' REQUESTED INSTRUCTION NUMBER FIVE: In

---

3. See Dean v. Dean, 226 S.W. 492, supra, where it was held that a son promised land by his mother if he would move on it and improve it and the son did so, a gift was effected even though the son absented himself from the property for several years, no abandonment by him being shown.

connection with Special Issue Number Four, you are instructed that the term 'valuable and permanent improvements' as used therein means the improvements made must be of a permanent nature, and of such value, in comparison with the nature and value of the property upon which the improvements are made, as to enhance the value of such property to a substantial degree."

■ We overrule appellants' point based on the refusal of the trial court to submit first requested instruction for the reason that if we are correct in holding, in accordance with the decision in Wootters, that the evidence was sufficient to sustain an oral gift then this instruction would have merely tended to mislead and confuse the jury. It would not have informed the jury that if they found that the Halls moved on the ranch and took over its operation that a gift, as promised by Mrs. Everett, would have been established.

■ We overrule appellants' points relative to the failure of the trial court to submit its requested instructions two and four further defining the word "possession" as used in the charge.

In its charge the Court in connection with special issue number three inquiring if the Halls entered into possession of the ranch the Court instructed the jury that, "the word 'possession' as herein used, does not necessarily mean exclusive possession, but can mean the joint possession of Plaintiffs with Barbara Everett."

The form of submission of this issue employed here was used in Scott v. Cliett, 213 S.W.2d 562, Tex.Civ.App., Galveston (1948) n. w. h. One of the cases cited by the Court in ruling upon the sufficiency of the evidence to support a finding of "possession" was Patterson v. Patterson, 27 S.W. 837, Tex.Civ.App., Austin (1894) writ ref. In that case an oral gift of land from a master to his former slave for the latter taking care of him during his life time was sustained even though the two were in joint possession of the property, the Court saying:

"Possession of the property is essential in order for the gift to ripen into title; and, while it is true that appellee was not in exclusive possession of the property during the lifetime of W. T. Patterson, she was in possession as his servant, and was in such possession as was contemplated by him as sufficient to protect her interest and right as a donee. Her ownership and possession was by him recognized and admitted during his lifetime; and, although her possession was not exclusive, or dominion of the property absolute, it was evidently so intended and considered by both that her possession and present right of enjoyment of the property was equal to that of Patterson."

Appellants cite the cases of Dawson v. Tumlinson, 150 Tex. 451, 242 S.W.2d 191 (1951) and Powell v. Wiley, 141 Tex. 74, 170 S.W.2d 470 (1943) in support of these points.

In Tumlinson the alleged donor and the donee lived across the street from each other. The donee claiming an oral gift of donor's house and lot if donee would take care of her as long as she lived. The donee never moved into donor's house although she cleaned it, carried donor meals and generally looked after her. The Court held this was no evidence of possession of the house by donee sufficient to support a gift.

In Wiley the Court held that there was sufficient evidence to sustain a jury finding that the donee of land did not go into exclusive possession of the land after the gift. The trial court instructed the jury in connection with this issue as follows: 'By the term 'exclusive possession,' as used herein, is such possession as gives one the use and control of the property and excludes all others from a like use or control." No objection was made to that instruction. There was not there, as here, evidence of a dual possession, but there was evidence

that the transfer of possession of the property from the donor to the donee was not intended to transfer the donor's right of control as owner or that the donor ever contemplated such possession as signifying the execution or consummation of the promised gift.

The Court in Wiley held that the negative answer of the jury to the issue regarding possession or the judgment of the trial court was a determination that there was no transfer to the donee of the right of control which pertained to the status of the owner of the land.

We do not consider Wiley to be relevant to the facts of this case. If the charge requested by appellants had been given the jury would have had reason to believe that the Halls had the right to evict Mrs. Everett from the ranch. This not only would have been wrong but it would have been unfair to appellees in that it would have cast upon them a practically impossible burden.

█ We also overrule appellants' points relating to their requested jury instructions three and five wherein they sought further definition of the term "valuable and permanent improvements," as well as their general point based on an accumulation of errors.

The Court, in its charge, did not define or explain the term, "permanent and valuable improvements." Appellants cite no cases in which such definition or explanation is given or required. We are of the opinion that these were words of ordinary significance and meaning and their definition or explanation would have been supererogatory.

Finding no error, the judgment of the trial court is affirmed.

Affirmed.

HUGHES, Justice (concurring).

In remanding this case to this Court the Supreme Court agreed with appellant that in evaluating and overruling appellants' motion for an extension of time for filing a statement of facts we used "an erroneous rule of law." The Supreme Court further stated, "The court of civil appeals has determined the issue of good cause under an erroneous rule of law." 430 S.W.2d 483.

The rule of law which we applied in overruling appellants' motion is reflected by the following quotation from our opinion:

"Our holding simply is that waiting twenty-three or twenty-four days before ordering a statement of facts is not acting *promptly within the above rule* and that unless it be shown that had the statement of facts been ordered promptly it still could not have been prepared within the time allowed good cause within Rule 386, T.R.C.P., as construed in Matlock v. Matlock, 151 Tex. 308, 249 S.W.2d 587, is not shown. There the Court emphasized that under the Rule appellant must show 'good cause why he *could not* file' (italics ours) the record timely, and further stated that *Courts of Civil Appeals have but little discretion in determining whether to permit the late filing of a transcript.*" Tex.Civ. App., 421 S.W.2d 921 (Italics added).

The Supreme Court in reversing us had this to say about Matlock:

"Nothing said in this opinion is intended to detract from our decision in Matlock or from our opinion as it dealt with the fact situation in that case. But our statement in Matlock that the fact situation before it 'left the Court of Civil Appeals with but little discretion in determining whether or not to permit the late filing of a transcript' should not be interpreted as meaning that courts of civil appeals have little or no discretion to permit the late filing of transcripts and statements of facts in other situations."

I submit that it was not the "fact situation" in Matlock which prompted the Court there to hold that the Courts of Civil

Appeals were left "with but little discretion" in determining whether to permit the late filing of a record. It was Rule 386, as there interpreted, which left us with but little discretion. Under the *facts* of Matlock we had *no* discretion.

The following quotation from Matlock demonstrates the validity of this comment:

"When, under authority of the Legislature, this court adopted rules of civil procedure it brought forward in Rule 386 amended Article 1839 without any change material here. It preserved the exact language of the statute as amended in 1933 and 1939, which provided that the motion must show 'good cause * * * why said transcript and statement of facts could not be so filed.' The rule cannot, therefore, be treated as one adopted by the court for its convenience or for the more orderly submission of causes, which the court might feel at liberty to waive for any cause deemed by it to be sufficient. To the contrary, the rule carries forward an unambiguous statute declaring the public policy of the State on a question of importance in the administration of justice. When the Legislature in 1931 materially reduced the time for filing the transcript, it declared in the emergency clause that the crowded condition of the dockets of the courts 'demands that the laws governing the practice and procedure therein be so amended as to expedite and simplify the business of the Courts as soon as possible.' The same language appears in the emergency clause of the Act of 1933, indicating that by granting additional time within which to file a motion for permission to file a transcript after the sixty-day period, the Legislature intended to restrict the meaning of 'good cause' to cases in which the appellant could not file the transcript within the sixty-day period. Obviously, that restriction left the Court of Civil Appeals with but little discretion in determining whether or not to permit the late filing of a transcript." 151 Tex. 308, 249 S.W. 2d 587.

Cases from other Courts of Civil Appeals which *expressly* hold that, under Matlock, it is the *rule* that leaves the Courts of Civil Appeals with but little discretion in these matters are: State v. Camper, 261 S.W.2d 465, Dallas, (1953) writ ref.; Jaye v. Texas Consolidated Oils, 287 S.W.2d 688, Dallas (1956) n. w. h.; Couch v. City of Richardson, 313 S.W.2d 949, Dallas (1958) writ ref. n. r. e.; Consolidated Casualty Insurance Co. v. Wade, 373 S.W.2d 841, Corpus Christi (1963) writ dismissed; Williams v. Williams, 392 S.W.2d 539, Tyler (1965) n. w. h. To the same effect is 4 Tex.Jur.2d, Appeal and Error—Civil—Sec. 564, p. 88.

In Wigley v. Taylor, 393 S.W.2d 170, Tex.Sup. (1965) cited in both prior opinions herein, the Court had an excellent opportunity to disavow Matlock, but the case was not mentioned.

In Douglas v. Wheeler, 306 S.W.2d 956 (1957) this Court denied appellant an extension of time within which to file a statement of facts under circumstances similar to but more appealing than those presented here, the Court stating the rule to be applied in this language:

"Even though the trial court is vested with 'broad discretion' in determining what is good cause for the late filing of a statement of facts in that court, State v. Camper, supra, in Matlock v. Matlock, 151 Tex. 308, 249 S.W.2d 587, it is said that the meaning of good cause for failure to timely file the transcript in the Court of Civil Appeals is restricted to cases in which the transcript could not be filed within the sixty day period and that the Court of Civil Appeals is left 'with but little discretion in determining whether or not to permit the late filing of a transcript.'"

A writ of error was applied for in that case but the Supreme Court did not grant the writ and remand the case to this Court

on the ground that we had used an erroneous rule of law, rather the Supreme Court approved the decision of this Court in refusing the writ because it found no reversible error.

I am delighted that the Supreme Court has modified the harsh rule of Matlock. I regret only that litigants, such as Douglas, have been deprived of their right of review of adverse judgments because of a breakdown in communications between the Supreme Court and the Courts of Civil Appeals.

I concur in the action of this Court in granting appellants' motion for an extension of time within which to file a statement of facts.