### The STATE of Texas, Appellant,

v.

### LUBY'S FUDDRUCKERS RESTAURANTS, LLC, Appellee.

### NUMBER 13-16-00173-CV

Court of Appeals of Texas, Corpus Christi-Edinburg.

Delivered and filed June 15, 2017.

John Seth Johnson, Assistant Attorney General, Austin, TX, for Appellant.

H Dixon Montague, Vinson & Elkins LLP, Houston, TX, for Appellee.

Before Chief Justice Valdez and Justices Rodriguez and Hinojosa

### MEMORANDUM OPINION

Memorandum Opinion by Justice Rodriguez

This appeal concerns a trial court's award of damages for the State's taking of property belonging to Luby's Fuddruckers Restaurants, LLC. The trial court entered judgment on a jury verdict awarding Luby's $1,334,183 as just compensation for the taking and awarding $480,000 on Luby's claim for lost profits. By two issues, the State appeals the award of lost profits. By one issue, Luby's cross-appeals the trial court's exclusion of certain language from the jury charge regarding the value of the cafeteria's kitchen equipment. We find no abuse of discretion in the jury charge, but we agree with the State that the award of lost profits constituted an impermissible double recovery. We affirm in part and reverse and render in part.

## I. BACKGROUND[1]

The subject of this suit is a Luby's cafeteria situated along U.S. 290 and 34th Street in Houston, Texas ("the cafeteria"). On August 7, 2012, the State filed this condemnation suit to take a strip of the cafeteria's parking lot for purposes of a project to widen U.S. 290. Both parties agreed that the taking also rendered the cafeteria incapable of operating in its current form; with a substantial amount of parking gone, the cafeteria could not comply with a Houston parking ordinance. Luby's further contended that the parking situation was inadequate to meet customer demand and would also breach a restric-

---

[1]. This case is before the Court on transfer from the First Court of Appeals in Houston pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through Ch. 49, 2017 R.S.). Because this is a transfer case, we apply the precedent of the First Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

tion in the cafeteria's deed which set minimum parking requirements.

The State agreed with Luby's that the taking rendered the building and all improvements valueless in their current form and that Luby's was entitled to compensation for this loss. Luby's announced its intention to demolish the current cafeteria and rebuild a smaller facility on the same site which could comply with the parking ordinance, the deed restriction, and market demand. The State further agreed that Luby's was entitled to compensation for the cost to achieve the demolition.

However, the parties disputed the amount of compensation owed. Special commissioners were appointed to value the taken property, and they returned a condemnation award of $1,795,853. Both parties objected to the award, and the case proceeded to the trial court. See TEX. PROP. CODE ANN. § 21.018 (West, Westlaw through Ch. 49, 2017 R.S.).

Prior to the jury trial, the State filed a motion to dismiss for want of jurisdiction. According to the motion, Luby's had lodged a counterclaim for lost profits; Luby's asserted that the demolition and rebuilding of the cafeteria would take twelve months to complete, and that Luby's was entitled to compensation for lost profits during this period. The State argued that no recovery for lost profits was allowed under Texas law. Luby's responded that recovery of lost profits was allowed under Houston Court of Appeals precedent. The trial court agreed with Luby's and overruled the State's motion.

At trial, Luby's presented evidence that this location had net profits of $40,000 per month. Luby's also presented evidence that it had begun preparation for the twelve-month process of demolition and construction, during which the cafeteria would be closed and unavailable to generate income. Luby's asked the jury to award $480,000 to compensate for lost profits during this process.

The parties also presented evidence concerning the market value of the strip of land taken and, on the remaining land, the value of the soon-to-be demolished cafeteria and related fixtures. Luby's offered an appraisal expert, Mark Sikes. Sikes performed his valuation according to the "cost approach," which focuses on the cost of replacing the taken property. Sikes valued the taking by comparing the market value of the cafeteria property before the taking and the market value after the taking. According to Sikes, the property value before the taking was $4,137,024, the value after the taking was $1,179,263, and the compensable taking was the difference between the two: $2,959,737. Included in this figure was roughly $444,000 to compensate for various kitchen equipment, such as vent hoods, prep tables, and a fryer. Luby's contended that these pieces of equipment were permanent fixtures to the cafeteria building, and therefore the value of the equipment should be included in any award for the taken building.

The State offered Mike Welch, its own appraisal expert. Welch testified that the cost approach was the least reliable of three approaches used to appraise property, the other two being the comparable sales approach and the income approach. Welch determined the cafeteria's market value by appraising the property under all three approaches and taking their weighted average, placing more weight on the comparable sales and income approaches. Following this method, Welch estimated the compensable difference in market value to be $1,334,183. Welch acknowledged that this valuation did not account for the kitchen equipment that Luby's claimed was worth $444,000; he testified that most of this equipment was not truly affixed to the property and could be easily removed

and salvaged, and therefore did not qualify as compensable fixtures. Welch did, however, include a walk-in freezer in his estimate, which he believed to be a fixture or permanent improvement.

At the charge conference, Luby's proposed a jury question and a jury instruction, both of which related to Luby's claim for the kitchen equipment. The proposed question would have modified the main jury question and asked the jury to value the whole property "including the building and the fixtures and the constructive fixtures within the building." The proposed instruction would have explained the legal definition of a compensable "fixture," with language drawn from Texas case law. It would have also informed the jury that under certain circumstances, personal property can be "constructive fixtures"— that is, not directly attached to the property, but still intended to be a permanent improvement that is compensable in a taking. The trial court refused the question and the instruction.

For the condemnation claim, the jury returned an award of $1,334,183, which was the amount proposed by the State and its experts. Separately, the jury also awarded $480,000 for lost profits, which was the amount proposed by Luby's. These appellate proceedings followed.

## II. CLAIM FOR LOST PROFITS

In its first issue, the State argues that in light of the main condemnation award of $1,334,183, any award for lost profits was an impermissible double recovery. The State argues that in partial takings cases, the general rule forbids any independent claim for lost profits. Luby's argues that under *State v. Whataburger*, recovery of lost profits is allowed when a taking causes "material and substantial impairment of access" to the property. 60 S.W.3d 256 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). According to Luby's, *Whatabur-

ger* should lead us to conclude that since the cafeteria must be destroyed, this qualifies as a substantial impairment of access, opening the door to an independent award of lost profits. In response, the State argues that a careful reading of the *Whataburger* court's reasoning should instead lead us to conclude that lost profits are not allowed under the facts of this case. We agree with the State.

### A. Applicable Law

██ If a governmental entity condemns only part of a tract, adequate compensation is required for both the part taken and any resulting damage to the remainder. *Cnty. of Bexar v. Santikos*, 144 S.W.3d 455, 459 (Tex. 2004). But not all damages to remainder property are compensable. *Id.* Whether damages can be recovered depends on what kind of damage is involved. *Id.* Compensability is a question of law for the court, and it is subject to de novo review. *Id.*

██ Damages to remainder property are generally calculated by the difference between the market value of the remainder property immediately before and after the condemnation, considering the nature of any improvements and the use of the land taken. *Id.* Texas recognizes three approaches to determining the market value of condemned property: the comparable sales approach, the income approach, and the cost approach. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 871 (Tex. 2009) (citing *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001)). Under the comparable sales approach, the appraiser finds data for sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property. *Sharboneau*, 48 S.W.3d at 182. The comparable sales approach is preferred, *id.*, but when this approach is

unworkable, courts will accept testimony based on the income approach and the cost approach. *Id.* at 183. The income approach is appropriate when the property would, in the open market, be priced according to the rental income it generates. *Id.* This approach involves estimating the rental income of the property and applying a capitalization rate[2] to determine market value. *See Cent. Expressway*, 302 S.W.3d at 870. The cost approach looks to the cost of replacing the condemned property minus depreciation, and it is best suited for valuing improved property that is unique in character and not frequently exchanged on the marketplace. *Sharboneau*, 48 S.W.3d at 183. All three approaches are designed to approximate fair market value, which is the amount a willing buyer would pay a willing seller for the property. *Cent. Expressway*, 302 S.W.3d at 871.

■ Texas law allows income from a business operated on the property to be considered in a condemnation proceeding in two situations: (1) when the taking, damaging, or destruction of property causes a material and substantial interference with access to one's property, lost profits may be awarded as damages, *id.* (citing *City of Austin v. Ave. Corp.*, 704 S.W.2d 11, 13 (Tex. 1986)), and (2) when only a part of the land has been taken, evidence relating to lost profits is admissible, not as a separate item of damage, but as a means of demonstrating the taking's effect on the market value of the remaining land and improvements. *Id.*; *see City of Dallas v. Priolo*, 150 Tex. 423, 426–27, 242 S.W.2d 176 (1951). Absent one of these two situations, income from a business operated on the property is not recoverable and should not be included in a condemnation award. *Cent. Expressway*, 302 S.W.3d at

871. Courts have applied this rule for two reasons: first, because profits from a business are speculative and often depend more upon the capital invested, general market conditions, and a manager's business acumen than it does on the business's location; and second, because only the real estate and not the business has been taken and the owner can presumably continue to operate the business at another location. *Id.*

■ To establish a "material and substantial interference with access to one's property"—the first scenario described above—it is necessary to show (1) a total but temporary restriction of access; or (2) a partial but permanent restriction of access; or (3) a temporary limited restriction of access brought about by an illegal activity or one that is negligently performed or unduly delayed. *Ave. Corp.*, 704 S.W.2d at 13.

## B. Analysis

■ By its first issue, the State argues that the jury's award of $480,000 on Luby's lost profit claim is invalid under Texas law. According to the State, Luby's had already effectively received an award to compensate for lost profits: the jury awarded Luby's $1,334,183 for the market value of the property, and the property's capacity to generate profit was already factored into the market value of the property. The award of lost profits therefore constituted a double recovery.

The State's argument is supported by the second rule outlined in *Central Expressway*: "when only a part of the land has been taken," evidence relating to lost profits is admissible, *not as a separate item of damage*, but as a means of demon-

2. Texas courts have defined the capitalization rate as the rate of return that investors would require before they would invest in the income-producing property, taking into account all the risks involved in that particular enterprise. *Polk Cnty. v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex. 1977).

strating the taking's "effect on the market value of the remaining land and improvements." 302 S.W.3d at 871 (emphasis added). It cannot be disputed that here, "only a part of the land has been taken...." *See id.* In response, Luby's asserts that this case also falls under the first rule in *Central Expressway*: lost profits may be independently awarded when the government's actions cause "a material and substantial interference with access to one's property." *Id.*; *see Ave. Corp.*, 704 S.W.2d at 13.

Luby's relies primarily on *Whataburger* as support for its position. However, as the State points out, there is a critical distinction between *Whataburger* and this case, and this distinction causes Luby's argument to falter.[3]

In *Whataburger*, a highway project required the taking of parking spaces at a Houston restaurant. 60 S.W.3d at 260. The State agreed with Whataburger that the taking made it necessary to demolish the restaurant, which Whataburger rebuilt on another part of the land. *Id.* The parties presented competing experts who both valued the property according to the cost approach. *Id.* at 263. The trial court awarded Whataburger $1,255,622.80 for the condemnation claim, which the State did not contest. *Id.* at 260.

Whataburger also brought a claim for lost profits for the period that its business was inoperable, and the trial court awarded $268,524 for this claim. *Id.* On appeal from the lost-profit award, the Fourteenth Court of Appeals agreed that the taking caused a total but temporary restriction of access to the restaurant. *See id.* at 261; *Ave. Corp.*, 704 S.W.2d at 13.

The State argued that in light of the condemnation award for the market value of the property, any recovery for lost profits would constitute a double recovery. *Whataburger*, 60 S.W.3d at 261. The court disagreed and reasoned that lost profits would not constitute a double recovery so long as the profitability of Whataburger's property was not a factor in arriving at its market value. *Id.* The *Whataburger* court correctly observed that in general, the cost approach does not take account of the property's ability to generate profits in estimating the value of the property. *Id.* at 263. This approach accounts for the cost of replacing the taken property. *Id.* at 262. Since the experts for both parties relied exclusively on the cost approach, the court concluded that profitability was not reflected in the market-value award for the condemnation claim, and there was no double recovery. *Id.* at 263.

Here, unlike *Whataburger*, Welch, the State's expert, placed great emphasis on the sales comparison and income approaches, and took little account of the cost approach. The jury entered an award which exactly matched the valuation proposed by Welch, signifying that the jury also believed the sales comparison and income approaches to be the best measure of the property's value.

As the *Whataburger* court recognized, the sales comparison and the income approach both take account of the property's ability to generate profits. Under the income approach, the value of a property is a direct derivation of the property's ability to generate profit. *See Cent. Expressway*, 302 S.W.3d at 870. And according to the *Whataburger* court, a property's ability to

---

**3.** More broadly, the State urges this Court to conclude that *Whataburger* was erroneously decided. We decline to do so, especially given that we hear this case on transfer from the First Court of Appeals—a court with a unique relationship to the authoring court of *Whata-* *burger*, the Fourteenth Court of Appeals. *See* Tex. R. App. P. 41.3; *see also* Tex. Gov't Code Ann. § 22.201(b) & (o) (West, Westlaw through Ch. 49, 2017 R.S.) (providing that the First and Fourteenth Courts of Appeals have concurrent jurisdiction over ten counties).

foster profit is "an inherent factor [in comparable sales approach] because a willing buyer will normally pay more for a tract containing a profitable enterprise than for a similar tract containing an unprofitable enterprise. Thus, '[t]he ability of a business to make a profit is reflected in its market value.'" *Whataburger*, 60 S.W.3d at 262 (quoting *City of San Antonio v. Guidry*, 801 S.W.2d 142, 150 (Tex. App.—San Antonio 1990, no writ)). Under either approach, "[w]hether there is an interruption of profits or the condemnee ever rebuilds his business is of no moment because he has been fully compensated for the taking." *Id.*

Here, Welch gave great weight to the sales comparison and income approaches, and the jury followed suit. Under *Whataburger*, because "the profitability of [the] restaurant was a factor in arriving at the 'market value' of the property, it cannot also recover for lost profits." *See id.* at 261; *State v. Johnson*, 444 S.W.3d 62, 75 (Tex. App.—Dallas 2014, pet. denied) (rejecting a claim for lost profits as a double recovery under *Whataburger* because condemnation experts had relied on the comparable sales and income approach—"valuation methods that considered the ability of his property to generate money"). We agree with the State that the award of lost profits was an impermissible double recovery. We sustain the State's first issue.

### III. EVIDENCE OF LOST PROFITS

By its second issue, the State argues that the trial court erred in admitting evidence of Luby's lost profits. Having already reversed the lost-profit award, we need not address the issue further. *See* TEX. R. APP. P. 47.1.

### IV. JURY CHARGE ERROR

On cross-appeal, Luby's contends that the trial court abused its discretion in excluding two requested modifications to the jury charge: a modification to the main jury question in the case and the addition of an instruction defining fixtures. Both requests related to Luby's claim that the State owed it compensation for certain kitchen equipment.[4] According to Luby's, this equipment was part of the compensable taking because the equipment was integrated into the facility and was intended to be a permanent fixture. In support of this point, Luby's proposed to modify the following jury question by adding the italicized text:

What do you find is the difference between the market value of the whole property owned by LUBY'S FUDDRUCKERS RESTAURANTS, LLC, *including the building and the fixtures and constructive fixtures within the building*, before the STATE OF TEXAS' taking on November 16, 2012, and the market value of its remaining property after the taking, *including the cost to cure*?

(Emphasis added). The trial court refused Luby's request.

Luby's also requested the addition of an instruction to inform the jury of the three-factor legal test for determining whether equipment is a compensable fixture. The

---

4. As an initial matter, State argues that Luby's waived any error by failing to object to the State's valuation of the Luby's property. We disagree. On appeal, Luby's does not complain of the introduction of the State's valuation evidence, it complains of the exclusion of Luby's proposed jury charge. When the State's evidence was introduced, the charge conference had not yet occurred, and the evidence gave Luby's no reason to suspect that the trial court would later refuse instructions relating to the kitchen equipment. Instead, Luby's fully preserved this issue by requesting a specific charge, which was refused by the trial court under endorsement, *see* TEX. R. CIV. P. 276, and articulating further grounds for objection, which were ruled on by the trial court. *See* TEX. R. APP. P. 33.1(a).

instruction would have also described Luby's theory concerning "constructive fixtures." The requested instruction read as follows:

Three factors are relevant in determining whether the kitchen equipment has become a fixture, that is, a permanent part of the real estate to which it is affixed: (1) the mode and sufficiency of the annexation, either real or constructive; (2) the adaptation of the article to the use or purpose of the building; and (3) the intention of the party who annexed the equipment to the building. The third criterion dealing with intention is preeminent, whereas the first and second constitute evidence of intention. Additionally, equipment can be constructively annexed to the building even if it is not physically attached. If the equipment is necessary to the operation of a business and is only moved short distances for cleaning or operational purposes, it can be considered as constructively annexed to the building and a part of the real estate, as if it were physically attached.

The trial court refused the instruction entirely. The trial court reasoned that Luby's proposed language would "invade the purview of this jury. I believe this is a fact-finding." The trial court explained that rather than defining fixtures and constructive fixtures, it was "up to [the jury] to determine, I think, in determining damages whether, in fact, is it part of the property that can be moved or is it a fixture, it has become so attached to the property that it is considered part of the property."

On appeal, Luby's contends that the trial court abused its discretion in refusing the requests. Luby's asserts that the proposed charge correctly guided the jury on the law, it was supported by Luby's pleadings and evidence, and it was necessary to ensure a proper verdict on compensation. Luby's asserts that without such guidance,

the jury was likely to—and did—deprive Luby's of its constitutional right to be made whole in the event of a taking.

## A. Applicable Law: Jury Charge

We review a trial court's decision to submit or refuse a particular question, instruction, or definition for an abuse of discretion. *King Fisher Marine Serv., L.P. v. Tamez,* 443 S.W.3d 838, 842 (Tex. 2014) (definitions); *Shupe v. Lingafelter,* 192 S.W.3d 577, 579 (Tex. 2006) (per curiam) (instructions); *Pitts & Collard, LLP v. Schechter,* 369 S.W.3d 301, 318 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g) (questions). The trial court abuses its discretion when it acts without regard for any rules or guiding principles. *Caffe Ribs, Inc. v. State,* 487 S.W.3d 137, 142 (Tex. 2016).

Under the precedent of the Houston First Court of Appeals, the trial court has broad discretion in submitting the jury charge, subject only to the requirement that the questions submitted must (1) control the disposition of the case; (2) be raised by the pleadings and the evidence; and (3) properly submit the disputed issues for the jury's determination. *Dernick Res., Inc. v. Wilstein,* 471 S.W.3d 468, 495 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *Lone Starr Multi-Theatres, Ltd. v. Max Interests, Ltd.,* 365 S.W.3d 688, 699 (Tex. App.—Houston [1st Dist.] 2011, no pet.). In all jury cases, the court shall submit the cause upon broad-form questions whenever feasible. Tex. R. Civ. P. 277; *Thota v. Young,* 366 S.W.3d 678, 689 (Tex. 2012).

A trial court must give "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277. When a trial court refuses to submit a requested instruction, the question on appeal is whether the request was reasonably necessary to

enable the jury to render a proper verdict. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000) (per curiam) (op. on reh'g). An instruction may be necessary to define legal and technical terms. *St. James Transp. Co., Inc. v. Porter*, 840 S.W.2d 658, 664 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *see also Muhs v. Whataburger, Inc.*, No. 13-09-00434-CV, 2010 WL 4657955, at *8 (Tex. App.—Corpus Christi Nov. 18, 2010, pet. denied) (mem. op.). As the reviewing court, we must look at the court's charge as practical experience teaches that a jury, untrained in the law, would view it. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009).

However, not every correct statement of the law belongs in the jury charge. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 291 (Tex. App.—Houston [1st Dist.] 1997, writ denied) (op. on reh'g). Judicial history teaches that broad issues and accepted definitions suffice and that a workable jury system demands simplicity in jury charges. *Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex. 1984).

"The court shall not in its charge comment directly on the weight of the evidence or advise the jury of the effect of their answers...." Tex. R. Civ. P. 277. Under the precedent of the First Court of Appeals, a jury instruction constitutes an impermissible comment on the weight of the evidence when it encourages the jury to give undue weight to certain evidence, *GTE Mobilnet*, 955 S.W.2d at 292, or when it unnecessarily suggests the trial court's opinion concerning an issue. *Centurion Planning Corp., Inc. v. Seabrook Venture II*, 176 S.W.3d 498, 511 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

## B. Applicable Law: Fixtures

Where fixtures are of such a character that if put in by the owner, they would constitute a part of the real estate, they must be paid for as real estate by the party condemning the land. *State v. Clear Channel Outdoor, Inc.*, 463 S.W.3d 488, 494 (Tex. 2015). Three factors are relevant in determining whether personalty has become a fixture, that is, a permanent part of the realty to which it is affixed: (1) the mode and sufficiency of annexation, either real or constructive; (2) the adaptation of the article to the use or purpose of the realty; and (3) the intention of the party who annexed the chattel to the realty. *Id.* at 493 (quoting *Logan v. Mullis*, 686 S.W.2d 605, 607 (Tex. 1985)). The third criterion dealing with intention is preeminent, whereas the first and second criteria constitute evidence of intention. *Id.* *Logan* further establishes that an improvement can be a fixture even if removal is physically possible. *Id.* at 494.

Intent is made apparent by objective manifestations. *Id.* at 493. As a general rule, intent is a question of fact to be decided by the jury. *Id.* But where reasonable minds cannot differ, the issue is one of law rather than one of fact. *Id.*

## C. Analysis

Luby's insists that without its requested modifications, the charge gave the jury "absolutely no guidance to determine the full and just compensation to which Luby's was entitled, which included fixtures." Luby's cites the rule that "[d]amages must be measured by a legal standard, and that standard must be used to guide the fact finder in determining what sum would compensate the injured party." *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex. 1973). We disagree.

The trial court did submit the central, controlling question for the jury's determination: the charge correctly asked the jury to assess the condemnation claim by evaluating the difference in market value before

and after the taking. *See Santikos*, 144 S.W.3d at 459; *Dernick Res.*, 471 S.W.3d at 495; *cf. Lone Starr Multi–Theatres, Ltd. v. Max Interests, Ltd.*, 365 S.W.3d 688, 698–99 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (reversing an award of damages for temporary lost use of land where the charge erroneously asked the jury to determine damages by evaluating separate component parts—duration of lost use and reasonable rent—rather than properly asking the jury to evaluate the central, controlling issue of total lost rent). The charge also instructed the jury on the correct legal definition of market value:

> the price that the property would bring when offered for sale by one who desires to sell, but is not obligated to sell, and is bought by one who desires to buy, but is under no necessity to buy, taking into consideration all the uses to which it was reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future.

This guidance follows the language of controlling cases. *See Caffe Ribs*, 487 S.W.3d at 142 (defining "market value" as "the price which the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying." (internal quotations omitted)); *Sharboneau*, 48 S.W.3d at 185 (noting that market value reflects "all uses to which the land is reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future" (internal quotations omitted)). Further, the charge explained what was to be considered highest and best use.

Luby's argues that beyond this guidance, the proposed charge on fixtures was necessary to render a proper verdict, and this omission was an abuse of discretion.[5] But Luby's does not direct our attention to any case holding that the trial court abused its discretion by failing to instruct a jury on the legal definition of "fixtures" or "constructive fixtures." Instead, we find multiple jury charges in a reporter of Texas court charges which are similar to the charge in this case, in that the questions and instructions either (1) do not mention fixtures and improvements, but instead generally refer to the "land" or "property," or (2) if they do specifically mention fixtures or improvements in the jury question, those terms were not subject to any instruction except a general definition of the "market value" of the whole property. *See* Tex. Ct. Charges: Real Property & Landlord-Tenant, Issue 0, pp. 47–69 (Will G. Barber ed., Butterworth Legal Publishers 1992).

Likewise, in appellate cases dealing with requests for instruction on the roughly synonymous term "permanent improvement," multiple courts have held that while such instructions are certainly helpful and can much improve the jury's grasp of the case, they are not "reasonably necessary" in all condemnation cases. *See Mandlbauer*, 34 S.W.3d at 912. "The Court, in its charge, did not define or explain the term, 'permanent and valuable improvements.' Appellants cite no cases in which such definition or explanation is given or required." *Patterson v. Hall*, 439 S.W.2d 140, 153 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.). "We are of the opinion that

---

5. The State argues that Luby's proposed modifications would have constituted an impermissible comment on the weight of the evidence. *See GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 291 (Tex. App.—Houston [1st Dist.] 1997, writ denied) (op. on reh'g). We express no opinion on whether this argument is correct; it is enough to say that the trial court's desire to avoid commenting on the weight of the evidence suggests that the trial court tried to maintain an appropriate "regard" for rules and "guiding principles." *See Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016).

these were words of ordinary significance and meaning and their definition or explanation would have been supererogatory." *Id.* "The jury could have been advised that permanent improvements are regarded as a part of the realty and thus their value can be considered only in connection with that of the realty." *State v. Turboff*, 431 S.W.2d 953, 954 (Tex. Civ. App.—Houston [1st Dist.] 1968, no writ). "But the giving or withholding of such an instruction ... was within the discretion of the trial court." *Id.* (emphasizing "the necessity of avoiding elaborate instructions"); *see also Nueces Cnty. v. Salley*, 348 S.W.2d 397, 400 (Tex. Civ. App.—San Antonio 1961, writ ref'd n.r.e.).

These cases suggest that based on its common meaning, the concept of a fixture or permanent improvement is within the reasonable intuition of an ordinary jury—at least to the extent that failure to include their definitions is not an abuse of discretion. *See Scott v. Houston Indep. Sch. Dist.*, 641 S.W.2d 255, 257–58 (Tex. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.) (rejecting an appellant's argument that the word "harm" was a technical term which required a definition and instead emphasizing "the natural construction and the ordinary connotation of the word." (internal quotations omitted)). The question which was submitted to the jury revolved around the phrase "the market value of the *whole property* owned by LUBY'S," and it was not an abuse of discretion for the trial court to determine that even a jury untrained in the law could distill the importance of both the land and any fixtures from this phrase. *See Columbia Rio Grande*, 284 S.W.3d at 862.

We conclude that while this charge "could have stated the law more adequately, it was within the court's discretion." *See Guidry*, 801 S.W.2d at 150. Accordingly, we overrule Luby's sole issue on cross-appeal.

## V. CONCLUSION

We reverse the portion of the trial court's judgment that awards Luby's $480,000 for its lost profits and render judgment that Luby's take nothing as to its claim for lost profits. We affirm the judgment of the trial court in all other respects.