

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-20-00218-CV

———————————————————

IN THE INTEREST OF J.J., A CHILD

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. 18-7953-431

Before Birdwell, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Mother appeals the termination of her parental rights to her child, J.J.[1] Because the trial court did not err by considering evidence of Mother's mental illnesses, we affirm its judgment.

## Background

In August 2018, then-seven-month-old J.J., his two older half-siblings,[2] and J.J.'s father were living with Mother's parents when the Department of Family and Protective Services petitioned for the children's removal and the termination of Mother's parental rights. Mother had not been in the home since May, and the Department was concerned about Mother's mental health and possible drug use, as well as anonymous reports of abuse committed by the grandparents against the children and Mother. The trial court entered a temporary order placing J.J. with his Father and requiring Mother to complete the terms of a Department service plan—requiring, for example, attending parenting classes, participating in counseling sessions, submitting to random drug screenings, refraining from the use of alcohol, and establishing "safe, stable[,] and appropriate housing." Father then moved into the paternal grandparents' home with J.J.; the two remained living there at the time of trial in February 2020.

---

[1] We redact J.J.'s name as well as the names of his parents to protect J.J.'s identity. Tex. R. App. P. 9.8(b)(2).

[2] Those children are the subject of a separate appeal.

Mother was allowed supervised visitation with J.J., and though she initially attended those visitations (albeit often arriving late), witnesses described her as distracted, preoccupied with her cell phone, and lacking any bond with J.J. In June 2019, she stopped attending her visitations with him altogether; coincidentally, she tested positive for marijuana use that month. She also stopped providing any in-kind child support. After June 2019, she made no attempt to check on J.J. or inquire about his wellbeing through her Department caseworkers or by contacting Father directly.

Her absence extended to the termination proceeding in general as well. The Department struggled to reach her because she changed her phone number several times, and her caseworkers became concerned about her living situation because she moved frequently and was believed to be homeless temporarily. At some point, she moved to Oklahoma, where she resided at the time of trial. The Department also became concerned about her involvement in an abusive relationship that fall—Mother reported to a caseworker that her boyfriend had "h[eld] her against her will and that he was a very dangerous . . . individual," but she did not report him to the police.[3] In September, Mother failed to attend a family group conference coordinated by the Department—in part because she could not find a babysitter for her dogs. She failed to attend mediation, claiming at trial that she had not been notified of the date. She

---

[3]This was not the only abusive relationship in which Mother had been involved during these proceedings. She reunited with her abusive ex-husband in July 2019 but broke up with him again after he "choked [her], he hit [her], threw [her] down on the ground." She did not call police to report the incident.

repeated a similar claim when confronted on the second day of trial with her absence from the first day of trial, though she admitted her receipt of a court order notifying her of the trial setting.

According to the testimony of Mother's friend Katherine Von Vogt; her psychiatrist of five years, Dr. S. Richard Roskos; and Father, this sort of withdrawal was not uncommon for Mother. Von Vogt and Dr. Roskos both testified to Mother's tendency to withdraw or "disappear." Father expressed his concerns about Mother's tendency to "seclude herself entirely" at even a minor inconvenience, causing Father to worry about J.J.'s safety if placed in her care. He thought her failure to attend the first day of trial was in character for her and symptomatic of her—in his words— "laundry list" of mental-illness diagnoses.

Those diagnoses caused the Department concern as well, but primarily because Mother's explanations or descriptions of her mental-health struggles were largely inconsistent and conflicted with her medical records—hundreds of pages of which were admitted into evidence at trial. Mother had been hospitalized for inpatient treatment at least four times between 2015 and 2018, for about a week to ten days each time. Mother did not deny being hospitalized for mental-health treatment but she disputed the diagnoses—particularly that of dissociative identity disorder (DID).

Dr. Roskos explained that DID causes "patients [to] have dissociative episodes to the point where they . . . seem like another person and have different personalities." Mother denied experiencing such alternative personalities—known as

4

"alters"—despite her having previously described them to treatment providers and to her caseworkers. Mother's Department caseworker, Abra Piacente, recalled an instance when Mother talked about having "suicidal alters, one specifically named Mary." Piacente attributed two of Mother's hospital stays to an alternate personality taking over causing Mother to cut herself on the inside of her legs and wrists. According to Piacente,

> [Mother] talked a lot about trying to integrate those alters and that she disliked how she felt like she was losing time because the alters were not always aware of each other. She talked about having homicidal ideations towards several members of her family, suicidal ideations towards herself. She talked about how specifically the alter Mary wanted to kill herself because [she] couldn't cope with the sexual trauma that she had endured.
>
> . . . She felt like she was . . . switching alters very inconsistently due to a large list of triggers that she had.

Father testified to his "meeting" several of her alternate personalities during their brief marriage and listed the names of seven of them. He explained that she would sometimes have a seizure before emerging as an alternate personality; other times she would simply "wake up and be acting differently than she was before." He described one persona as "always very angry" without apparent reason and testified that he would not "interact too much" with Mother in that state because of his fear that she would become physically violent. Mother would act negatively toward her children if possessed by that persona, and Father recalled an instance when she started cussing at her older son and calling him derogatory names. He further described

5

Mother as being emotionally and verbally abusive to himself and to her two older children, and he testified that in the spring of 2018 Mother had threatened to throw then-infant J.J. "as hard as she could against the ground." Mother denied ever exhibiting an alternate personality in front of her children, and she dismissed her speaking in various voices in front of them as her doing "different accents for fun."

Mother's DID diagnosis was recorded in her medical records, including records from her 12-day hospitalization in May 2018 after she attempted suicide by prescription-drug overdose and expressed homicidal ideations of drowning J.J. and Father and murdering her parents. Also noted in Mother's medical records were her diagnoses of bipolar disorder, posttraumatic stress disorder, attention deficit disorder, alcohol and marijuana dependencies, and sedative abuse. Additional notes included the following:

- Mother had "alters that need to be integrated" and that she "felt that she was hallucinating more and stumbling."

- Mother's "prominent borderline personality disorder" and confession to attempting suicide on eight occasions and cutting herself intentionally "several hundred times."

- Mother's claim that she had been a hostage in the past.

- Mother's "claim[] that she has a diagnosis of dissociative identity disorder and . . . [s]he also makes frequent reference to alters."

- Mother's descriptions of "auditory and visual hallucinations of 'a bad man scratching at the window and he has the ability to split his body in two.'"

6

In a psychological assessment completed as part of Mother's service plan, she failed to disclose the above-reported hallucinations and homicidal ideations. And at trial, Mother disputed having DID or exhibiting alternate personalities insisting that those were simply emotions that she had named and that she was learning to properly process. And while Dr. Roskos testified that her DID had been "less evident in the last couple of years," he admitted that was based on her own self-reporting and made clear that his role was limited to managing her medications and that he relied on Mother's representations that she was in therapy.

Mother attended therapy with psychotherapist Lois Vaillancourt during these proceedings. At trial, Vaillancourt described the abuse Mother claimed to have suffered at her parents' hands as "incredible trauma" and testified that she was not sure that she had seen anyone "with such extreme abuse." Though Vaillancourt did not testify to any details of the alleged abuse, Piacente recounted Mother's allegations that both parents had sexually abused her and possibly her older daughter, were controlling, and had "kept her medicated." Vaillancourt testified that, if Mother's descriptions of abuse were true, she would never trust the maternal grandparents to care for small children. But Vaillancourt was completely unaware that Mother's children were living in the maternal grandparents' home when Mother was hospitalized in May 2018, or that Mother's children continued to live there after Mother's release from the hospital and until their removal in August. According to Piacente, when she confronted Mother about the apparent conflict between her

allegations of abuse and the fact that she had entrusted the children to her parents, Mother stated that her parents refused to let her pick up the children and that she could not enlist the aid of law enforcement because her father "ha[d] connections to judges, attorneys, and the mafia, and law enforcement, and that nothing would happen if she attempted to contact them." At trial, Mother said that she had no choice and nowhere else to send her children.[4]

Not only did Mother neglect to tell Vaillancourt about leaving her children in the care of her allegedly abusive parents, but she also did not tell Vaillancourt that she stopped seeing J.J. in June 2019, had a history of drug abuse, tested positive for drugs during the termination proceedings, and had returned to a violent relationship with her ex-husband while the termination proceeding was pending. Vaillancourt also did not know that Mother had weaned herself off of her medications in September 2019—an act that had confused Dr. Roskos at the time because "she had been on them for a number of years beforehand."

Mother was also inconsistent in answering two drug and alcohol assessments; in the first Mother reported "a very extensive drug history," but in the second she denied having used many substances and denied any current usage—a statement contradicted by her positive drug tests in October 2018 and June 2019.[5] Her medical

---

[4]Mother also admitted at trial that she was staying with her parents while attending the trial and that her mother was driving her to and from court.

[5]At trial, Mother dismissed these as false positives.

records in 2018 described an extensive history of substance abuse—including marijuana, cough syrup, cocaine, and LSD—and noted that Mother "has a history of binge alcohol drinking since the age of 12 . . . . When she binges, she typically drinks 3 bottles of wine"; that Mother "states that she smokes marijuana daily, for the past 14 years"; and that she "[m]ost recently used cocaine, snorting it, in January of 2018 and did LSD last year." But at trial, she testified that she had not used cocaine or methamphetamine in 11 years.

Though her court-ordered psychological assessment recommended formal substance-abuse counseling, Piacente was unaware of Mother's participation in any such treatment. Mother testified that she had participated virtually in Alcoholics Anonymous and Narcotics Anonymous as required by her service plan, though she failed to provide any attendance logs from August 2018 through April 2019, nor logs from June 2019 through the time of trial in February 2020.

These issues undermined Mother's completion of her service plan. Her caseworkers doubted her truthfulness and, although Mother had completed an online parenting class, two psychosocial evaluations, counseling, drug and alcohol assessments, and psychological evaluations, they remained concerned about Mother's inability to demonstrate that she had learned anything or to put any lessons learned into practice. Piacente did not observe any change in Mother's parenting ability after she completed a parenting course and expressed concerns that Mother had failed to demonstrate an ability to remain sober, maintain stable housing, meet her own

9

mental-health needs, or meet her child's medical-health[6] needs. And, in Piacente's view, Mother may have required additional services but had "[left] out information that would have possibly recommended different types of treatments or additional treatments."

Before and during trial, Mother had difficulty providing a plan for a stable future, particularly one involving custody of J.J. At trial, she testified that she had been living in a two-bedroom apartment in Oklahoma for a few months, but she had never provided the Department with any photographs of the apartment nor did she provide any at trial. Though she was still under Dr. Roskos's care for medication management, he testified that Mother had missed her appointment scheduled for the first day of trial; Mother claimed that she had not been aware of the appointment. And she was no longer seeing a therapist, testifying that she was on a waiting list and had not found "a proper fit yet." She was unemployed but received disability payments of about $1,250 per month and federal student aid money because she attended online classes. After payment of rent and bills, she testified that she had about $350 to $400 to live on each month. When asked about her plans for the future, Mother testified that she planned to complete her college degree in political science and possibly attend law school, but she did not mention any plans for J.J.—

---

[6]One of Mother's older children suffers from a traumatic brain injury, is on the autism spectrum, and has attention deficit hyperactivity disorder.

when that was pointed out, Mother vaguely testified to her plan to "work with [her] kids" and "have them in school."

At the conclusion of the trial, the trial court terminated Mother's parental rights to J.J. on the grounds of endangerment, constructive abandonment, and failure to comply with the service plan, and it determined that termination was in J.J.'s best interest.

## Discussion

At the heart of Mother's three issues on appeal is her assertion that Section 161.003 is the only ground for termination of a parent's rights on the basis of mental illness or deficiency. *See* Tex. Fam. Code Ann. § 161.003. But her argument is contrary to established law. Section 161.003 is not the exclusive way to terminate the parental rights of someone with a mental illness or deficiency. *In re J.P.-L.*, 592 S.W.3d 559, 589 (Tex. App.—Fort Worth 2019, pet. denied).

For a trial court to terminate a parent–child relationship, the party seeking termination has to prove two elements by clear and convincing evidence: (1) that grounds for termination exist and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. §§ 161.001(b), .003(a); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Section 161.001 of the Family Code provides a veritable laundry list of grounds for termination, including the three upon which the trial court based its decision to terminate Mother's rights in this case: endangerment, constructive abandonment, and failure to comply with the service

11

plan. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O). Evidence of any one ground listed in Section 161.001 is sufficient to sustain a termination of parental rights when coupled with a best-interest finding. *See In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

Mother argues that the trial court reversibly erred by admitting evidence of her history of mental illness because the Department failed to plead for termination on Section 161.003's mental-illness grounds.[7] *See* Tex. Fam. Code Ann. § 161.003 (allowing termination of a parent's rights if she has a mental or emotional illness or mental deficiency that renders her unable to provide for the child's physical, emotional, and mental needs until his 18th birthday). But Mother is incorrect.

Section 161.003 is not the exclusive way to terminate the parental rights of someone with a mental illness or deficiency. *J.P.-L.*, 592 S.W.3d at 589. Evidence of mental illness—while not enough in itself to warrant termination—is relevant, for example, if the parent's mental state causes her to engage in conduct that endangers the physical or emotional well-being of a child. *In re T.G.R.-M.*, 404 S.W.3d 7, 14 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The State was therefore not required to plead Section 161.003 as grounds for termination in order to offer evidence

---

[7]At one point in her brief, Mother mentions that the mental-illness evidence was unfairly prejudicial—referencing Texas Rule of Evidence 403—but her trial objections were limited to relevance. She has therefore failed to preserve a Rule 403 objection. Tex. R. App. P. 33.1(a)(1)(A).

connected to Mother's mental illnesses. We overrule her first issue to the extent it argues otherwise.

As for her general complaint that her mental health was irrelevant, we cannot conclude that the trial court abused its discretion by admitting the evidence; it did not act arbitrarily or outside the zone of reasonable disagreement. *See* Tex. R. Evid. 401; *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016). Mother's mental illnesses were not only "of consequence in determining" J.J.'s best interest, but inextricably intertwined with much of the evidence. *See* Tex. R. Evid. 401. Her mental illnesses explained and contextualized her behavior, some of which endangered J.J.'s wellbeing. For example, Father attested to Mother's threat to pick then-infant J.J. up and "throw him as hard as she could against the ground." He also testified to her verbal abuse of her children and his fears that she would become physically violent when acting under an alternate personality. When Mother left her children in May 2018 for inpatient hospitalization, she was having suicidal ideations and homicidal ideations—including plans to drown J.J. And at that time, she left J.J. at her parents' home, where they were J.J.'s primary caretakers. For three months, J.J. was living in the home of his maternal grandparents, whom Mother had alleged committed acts of abuse—including sexual abuse—so serious that Vaillancourt described them as "extreme." Mother did not attempt to retrieve J.J. from her parents' home upon her release from the hospital—she left him there until he was removed by the Department in August.

13

Her inconsistent descriptions of her mental illnesses—both her diagnoses and her symptoms—were also wholly relevant to the Department's determinations that she had failed to exhibit an ability to appropriately parent J.J. and that she had not successfully completed the service plan. As Piacente testified, her lack of forthrightness regarding her mental health left open the question of whether additional services were required or would be beneficial.

And finally, Mother's mental-health status was relevant to her abandonment of J.J. because multiple witnesses testified to her tendency to withdraw or detach. Mother seems to have done just that in June 2019, when she stopped visiting J.J. and made no effort to check in on his wellbeing in the eight months before trial.

We cannot conclude that the trial court abused its discretion by admitting evidence of Mother's history of mental illness because it was relevant to the grounds of endangerment and abandonment and her failure to complete the service plan. We therefore overrule Mother's first issue. Because her second and third issues are predicated on our sustaining her first, we also overrule Mother's remaining two issues.[8]

---

[8]In her second issue, Mother argues that there was insufficient evidence to support the best-interest finding "absent [evidence of M]other's mental health." In her third issue, she argues that the "cumulative impact of error warrants reversal" "in the interest of justice and fairness." To the extent that Mother argues that "cumulative error" exists based on any trial court rulings apart from those discussed above, she has waived them by failing to provide citations to the record and supporting authority. *See Hall v. Stephenson*, 919 S.W.2d 454, 466–67 (Tex. App.—Fort Worth 1996, writ denied).

## Conclusion

Having overruled Mother's three issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered:  December 23, 2020