In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00060-CV

**CRISTY WEST, Appellant**

**V.**

**JIMMIE WARD, Appellee**

_____

**On Appeal from the 410th District Court
Montgomery County, Texas
Trial Cause No. 23-12-18872-CV**
_____

**MEMORANDUM OPINION**

A jury found that Appellant Cristy West (West) and Appellee Jimme Ward (Ward) were not informally married. West appeals the trial court's Final Judgment Denying Informal Marriage. In three issues, West complains that the evidence was legally and factually insufficient to support the jury's finding that there was no informal marriage, that the trial court abused its discretion by overruling her jury

charge objections, and that the trial court erred in denying her motion for new trial. For the reasons explained below, we affirm the trial court's judgment.

## BACKGROUND

West filed a Petition for Divorce against Ward, arguing that they were married on or about July 25, 2020, "without formalities, pursuant to § 2.401(a)(2) of the Texas Family Code, in that they agreed to be married and after the agreement they lived together in this state as husband and wife and there represented to others that they were married." West alleged that in the summer of 2020, she and Ward decided it was time to get married. West alleged that after learning that Texas recognized informal marriages, she and Ward bought a home in Houston, agreed to be married, celebrated their marriage in Jamaica, moved into their new Houston home on or about July 25, 2020, and began living together as husband and wife. West alleged that they publicly acknowledged their marriage in "many ways, including various posts on social media . . . and privately referring to each other as husband and wife." West alleged that the parties had a child in March 2022, celebrated their honeymoon in June 2022, and ceased to live together on or about February 6, 2023.

Ward filed an Answer and Verified Denial, arguing, among other things, that he and West were never ceremonially or informally married, there was never a mutual agreement to be married, and that the requirement for a common law marriage cannot be met. Ward filed an Unopposed Motion to Sever and/or Bifurcate

2

Trial of Common Law Marriage Issue. The trial court granted Ward's motion for a bifurcated trial and proceeding on the cause to determine whether a marriage existed.

**Lucy Verni Testimony**

During the trial on a common law marriage issue, Lucy Verni, a private chef, testified that she began working for West and Ward in February 2021. Verni testified that Ward introduced West as his wife. Verni explained that Ward offered her $50,000 to testify that he called West his fiancé and never called West his wife. On cross-examination, Verni testified that she told Ward that she did not believe that he and West were married and that she knew there was a wedding being planned for April 2023. Verni testified that West always maintained she was married to Ward, but Verni agreed that text messages from October 2022 showed West told Ward he could cancel the wedding and that they were engaged.

On redirect, Verni testified that the week before trial, Ward asked her to deny that he called West his wife and then recorded their conversation when she told Ward that she never heard him call West his wife and that she did not believe they were married. Verni testified that her statements to Ward during the recorded phone call were not true. On re-cross, Verni testified both that she did not lie and was lying when she told Ward she did not believe he was married. Verni also testified that months before Ward offered her $50,000, she told Ward in another recorded conversation she did not believe he was married to West.

3

On redirect, Verni testified that from February 2021 to October 15, 2022, she was unaware of any inconsistencies in West's and Ward's representations about being married. The jury also heard Verni testify that Ward was an honest person. On re-cross, Verni agreed that West's text message, which was dated August 18, 2022, stated West was single. Verni also agreed that even though she claimed that Ward offered her money to commit an illegal act and lie in court, she still asked Ward to get her football tickets, which she did not keep.

**Jimmie Ward Testimony**

Ward, a professional football player, testified that he and West dated in high school, and he was later drafted by a professional football team. Ward testified that in November 2018, he and West were in a relationship, and he gave West money to buy a home in Alabama. Ward explained that they did not share finances, and although West did not have his permission to access his social media accounts, Ward claimed West "hacked" one of his accounts in 2018.

Ward testified that in 2020, he and West were not engaged yet, but he had his lawyer draft a prenuptial agreement "[f]or the future." Ward explained that in February 2020, West did not have access to his bank account, credit cards, or social media accounts. Ward testified that in February 2020, the name on his Instagram account was "only1_nekosuave." Ward did not remember posting a comment to his

4

Instagram account in February 2020, stating "wifey" to one of West's Instagram pictures.

Ward agreed that due to the Covid-19 pandemic, everything was shutting down in March 2020, and he asked West's stepfather whether she and her son could move to Texas. Ward explained that a couple of days before he purchased an engagement ring, he asked West's stepfather for permission to marry West. Ward testified that he and West discussed where to live, because they were from Alabama, but Ward was playing football in San Francisco. Ward explained they chose Houston, Texas because of its location and major airport. Ward denied they chose Texas because it recognized common law marriage, and he claimed that he and West never discussed that fact. Ward testified that when he bought a home in Texas in July 2020, he did not know Texas's or Alabama's laws regarding common law marriage. Ward testified that he and West went to Jamaica to celebrate the purchase of his home and his birthday, and he denied the trip was to celebrate living together as a married couple because he "was not married." Ward recalled seeing West's Instagram post on July 18, 2020, that included a picture of them and her wishing him happy birthday, but Ward testified that the caption had been edited to include "husband." Ward testified the original caption "didn't had [sic] husband because we wasn't married."

Ward closed on his Texas home on July 23, 2020, but to his recollection, he did not stay the night in his home until January 2021, because he was at training camp playing football. Ward explained that he could be wrong about whether he stayed in the home after closing. After having his memory refreshed, Ward agreed that he flew from Texas to Alabama on July 24, 2020, and then flew back to Houston on July 25, 2020, which the trial court noted was the date West alleged as the date of marriage. Ward explained that on July 25, he stayed the night in Texas either at his home or a hotel, and Ward testified that at that point, he did not allow West to use his credit card or bank account or give her an allowance.

Ward testified that in December 2020, West started in vitro fertilization treatment (IVF) to help her have his son in March 2022, and he agreed to the treatment and paid most of the expense. Ward explained that in April 2021, he leased a Lamborghini for West, and in July 2021, he bought an engagement ring and "probably told a few friends and family members that I did get engaged." Ward acknowledged that a July 2021 post on his Facebook account included a picture of West in the Lamborghini with the engagement ring and stated "[m]ade her my wife.[]" Ward testified that the picture did not appear to be altered. Ward agreed he had given West a lot of money, including money for planning their wedding. Ward also admitted that he referred to West as his wife in a November 2021 text with his security man and sent West screenshots of the text referring to her as his wife. Ward

6

testified he was in California when he sent the texts to his security man and West, who were both in Texas. Ward denied he held himself out to someone in Texas that West was his wife, that he gave West a jacket that said "Mrs. Ward[,]" and that their June 2022 trip to the Maldives was a honeymoon trip.

Ward testified that in September 2022, he was not planning a party with West, and he claimed he had never seen the save the date card for an April 2023 wedding celebration for him and West. Ward initially agreed that in October 2023, he had West review a postnuptial agreement but then clarified that it was a rough draft of a premarital agreement. Ward believed that West was with him for the money, and he asked her to work. Regarding Verni's testimony that Ward offered her money to change her testimony, Ward testified that she made it up. Ward explained that Verni was his friend, and he called her multiple times the week before trial, because she helped him with various services at his home and wanted football tickets, which she later refused. Ward testified that he also called Verni because his lawyer had talked to her, and she was acting different. Ward believed West paid Verni money to lie.

On cross-examination, Ward explained that Verni was on his witness list, and that for the six months prior to trial, she had consistently stated that he and West were engaged and not married. Ward testified that he did not bribe Verni. Ward also testified that there never was a postmarital agreement. Ward explained he got the premarital agreement because he felt that West "just wanted more money and more

7

money." Ward testified that he and West got back together in 2018 after he became a professional athlete. Ward explained that before he bought his Texas home, he gave West money to buy a home in Alabama. Ward explained that he also transferred $1.5 million to West to settle a dispute between them.

Ward testified that from 2018 through January 2023, he primarily lived in California, and he filed a California resident income tax return from 2018 to 2022. Ward explained that he purchased his Texas home on July 23, 2020, to help with state income taxes, because California was taking over 50% of his check and he planned to eventually live primarily in Texas. Ward first learned he was going to be playing with the Houston Texans in March 2023.

Ward testified that West never used his name, and that when he bought his Texas home, they had decided to have a child together. Ward testified he bought the engagement ring and proposed to West in July 2021, and West found a wedding planner. Ward explained that he found out West lost the engagement ring when he received a phone call from State Farm, and West told him that State Farm paid her half of the ring's value. Ward later learned that West received the full value of the ring, and he did not receive any of the money.

Ward testified that text messages from July 2022 show that West told him he needed one more groomsman for the wedding, and in an August 2022 text message, West asked him if he was sure he wanted to get married before she paid money

toward the wedding. Ward testified they had a wedding planner. Ward explained that he and West argued, and in an August 2022 text, West stated she was single and done talking. Ward testified that West denied they were engaged in her deposition, but a September 2020 text message shows she stated she was engaged, and in another text message, West stated that she had been engaged since 2021. Ward explained that when West found his will, she sent a text message in October 2022, stating "'[w]on't be a wedding till that shit get changed. I'm not marrying nobody who momma . . . they power of attorney.'"

Ward testified that after West saw the premarital agreement, she sent a text message stating, "'[w]ith all due respect u can cancel the wedding lol I read your prenup and U crazy asf to think I'll sign that.'" Ward testified that at that point, he had already given West "[p]robably over 2 million." Ward testified that October 2022 text messages show that when he told West they could stay in a relationship but that he no longer wanted to get married, West told him she still wanted to get married. Ward testified when he broke up with West that same month, she never stated they were married and needed to divorce, but West stated her lawyers were "pushing a divorce because of common law. . . I don't wanna do that[.]'" Ward testified that in November 2022 emails, West admitted they were just engaged. Ward explained that the first time West mentioned anything about being married and

9

planning a wedding celebration was after he filed an Original Petition in Suit Affecting the Parent-Child Relationship (SAPCR) in November 2022.

Ward testified that West had accessed his social media and email accounts. Ward testified that September 2022 text messages show he asked West to stop getting into his Instagram and email accounts and changing things. Ward explained that his Instagram and Facebook accounts were linked, and a person can edit captions on previous posts. Ward denied making the July 16, 2021, post on his Facebook stating "[m]ade her my wife.[]" Ward also denied sending West a February 2023 email, which was dated after West filed for divorce and stated, "you was a good wife to me[,]" and Ward claimed "[t]his is her hacking my email." Ward admitted that in November 2021, he referred to West as his wife when he texted his security person, because he was not home, West's name was not on his home, and he had to give his security man permission to enter his home and fix the security system.

Regarding his income tax returns for 2020 and 2021, Ward testified that he listed himself as single. Ward explained that he also had health insurance as a single male, and West was on Medicaid as a single woman. Ward testified that he and West do not own real property together, and they never had a joint bank account or credit card. Ward denied that he purchased his Texas home because he could not get married in Alabama in 2020 because everything was closed due to the Covid-19 pandemic. Ward explained that to be married in Alabama, all they had to do was fill

10

out the marriage certificate, get it notarized, and mail the certificate to the proper authorities. Ward denied sending West a text message in December 2022 stating the marriage is over. Ward also testified that the Facebook post on his account stating "[h]appy birthday to my wife" was not an accurate representation because it had been edited.

**Cristy West Testimony**

West testified that she and Ward married in July 2020. West explained that she and Ward dated some while they were in high school and again while he was in college, and they got back together in 2017 and became exclusive when Ward "went broke and needed my help." West testified that Ward asked her for money in June 2018, and she paid his rent and car note for about six months. West explained that in the fall of 2017, Ward gave her $1.5 million to resolve a dispute between them. West testified that in November 2018, she purchased a home in Alabama using money she had saved, and she stated Ward lived there during the 2019 off-season. West stated that during Thanksgiving of 2019, Ward asked her stepfather for permission to marry her, and she stated they planned to marry at the courthouse in Alabama after the 2020 Super Bowl.

West testified that Ward gave her access to his email account in 2018, and she denied hacking into Ward's email account around Mardi Gras of 2023. West explained that Ward used her email address as the recovery email address on his

11

account and that he had accused her of violating his new email account, but she claimed she did not have the password to Ward's email account. West testified that Ward did not give her access to any of his social media accounts and that he had "[a] lot of people[]" managing his social media. West testified that Ward gave her a ring on July 16, 2021, but she denied that Ward proposed to her. West testified that Ward knew about the July 16, 2021, post stating "[m]ade her my wife[,]" and West stated he never complained about the post being improper. West testified that she did not have any discussions with Ward about social media posts related to the ring.

West explained that Covid-19 shut everything down after the Super Bowl, and at that time, she was unaware of any alternative ways of getting married in Alabama. West testified that she and Ward discussed relocating to a place where they could be common law married, and after they searched locations on Google, they went to Texas in May 2020 to look at homes. West explained they purchased a home in July 2020, but she did not contribute to its purchase. West testified that they went to Jamaica to celebrate on July 16 or 17, got the keys to the home on July 23, 2020, stayed at the house that night, and then flew to Alabama. West explained that when they returned to the home on July 25, 2020, the home was fully furnished, and she and Ward slept in the home that night. After moving to Texas, West claimed Ward referred to her son as his and gave her access to his bank accounts by giving her debit cards, credit cards, and his checkbook "[b]ecause I was now his wife." West

12

testified that Ward left around July 28 or 29 to go to California for football season but he lived in Texas.

West began IVF in January 2021, because Ward wanted a son, and their son was born in March 2022. West testified that Ward purchased the Lamborghini in April 2021 and the ring in July 2021. West testified that in December 2021, Ward gave her a jacket that says "Mrs. Ward[,]" and when she posted a picture of her wearing the jacket on Instagram, Ward commented with a heart. West explained she wore the jacket in Texas and that it means "I'm his wife." West explained that in 2022, she took a screenshot of the April 2022 post on Ward's page that included a picture taken in the Dominican Republic and stated, "Happy birthday to my wife[,]" and she stated she and Ward did not discuss the post or her not being his wife. West denied altering Ward's post.

West explained that she made the July 18 post on Instagram from Jamaica which included the caption "Happy 29th birthday to my Husband[.]" West testified that she and Ward did not discuss the post. West denied changing any of Ward's social media posts, and she claimed that prior to November 2022, Ward had permission to access her Facebook account, which had posts deleted between November 2022 and May 2023. West explained that when she referred to herself as being single in text messages with Ward, she was either playing or fighting with Ward. West testified Ward said he was single multiple times during fights.

13

West denied that Ward paid $180,000 in October 2021 and $100,000 in May 2022 for wedding expenses, stating they were not even discussing a wedding celebration at those times. West explained that she and Ward began planning a wedding celebration around June 2022, which included bridesmaids and groomsman at the reception but not any sort of officiant. West testified that it was not a wedding ceremony, but she had discussed purchasing a wedding dress. West explained that both she and Ward planned the celebration together. West testified even though they were married in July 2020, their June 2022 trip to the Maldives was their honeymoon trip, because the first year of marriage Covid-19 hit and the second year she was going through IVF treatment.

West explained that in her text messages with Ward, she referred to being engaged and having an engagement ring because Ward "switched' and told her they were only engaged because they did not have a certificate. West testified that she relied on Ward's statement about not being married and thought he was telling the truth. Around Thanksgiving 2022, West spoke with an attorney about common law marriage. Regarding the premarital agreement Ward wanted her to sign, West explained that she first saw the agreement in October 2022. West testified that at that time they were already married, and the agreement did not provide her with anything. West explained that in February 2023, Ward sent her an Instagram message stating she was being greedy by filing for divorce and claiming common law marriage.

14

On cross-examination, West agreed that she was not claiming that any of the text messages between her and Ward had been modified, and she stated the text messages she sent Ward were honest. West agreed that in her deposition, she testified that she knew she could be informally married by moving to Texas, could not recall what day she got married, and that they were married when they stayed in a hotel together. West explained that she did not understand the law prior to alleging in her pleading that they got married on the day the home was purchased and now believed that they were married when they moved into the home. West agreed that from 2017 to 2023, Ward lived and worked in California and was not living in Texas.

On cross examination, West stood by her prior testimony that she was never engaged or told anyone she was engaged despite referring to herself as engaged many times prior to the current litigation. West agreed she had referenced herself as being engaged after Ward gave her the ring in July 2021, and she told people in Alabama she was engaged before Ward gave her the ring. West admitted she testified in her deposition that she did not know whether she was engaged in September 2022 but claimed she may have been engaged at that time. West testified that she filed a petition alleging she was married in July 2020 even though she may not have been married in September 2022 because they did not have a certificate. West did not know whether that was being honest.

West testified she did not text, email, or post anything about getting married on July 25, 2020. West also stated she did not text or email anyone about being married prior to October 2022 when she alleged the relationship was falling apart. West stated the text messages between her and Ward were accurate communications that were sent before Ward filed his SAPCR and she filed for divorce. West admitted asking Ward in an August 2022 text message whether Ward was sure he wanted to get married. West also admitted sending Ward an October 2022 text message telling him there would not be a wedding until he changed his will and made her a beneficiary. West sent text messages in October 2022 telling Ward she had read the proposed prenuptial agreement, he could cancel the wedding, they had been engaged since 2021, she wanted to get married, and that they "[w]e're getting married[.]" West agreed that Ward sent her an October 2022 text message telling her he was not getting married.

On redirect, West explained that she made the statements in the text messages about being single and only engaged because she believed Ward when he told her they needed a certificate to be married. West testified that she never had health insurance as Ward's wife, never filed an income tax return asserting she was married, nor did she have a shared or a joint bank account with Ward.

**David Turnage Testimony**

David Turnage, Ward's State Farm Insurance agent, testified about documents regarding Ward's automobile policies and a July 2022 letter State Farm sent West regarding her claim. The trial court admitted West's automobile renewal policies for the periods of November 2021 through May 2023, and those policies state that Ward and West were assigned drivers who both had a "[s]ingle" marital status. Turnage testified that he did not personally ask Ward whether he was married or single because he inherited Ward's file from a different agent and that it could be accurate or inaccurate. Turnage explained that it is normal business practice to ask about marital status. The trial court also admitted State Farm's letter to West regarding her claim for a ring, and the letter informed West it had paid her $301,158 on her claim.

**Tiara Lambert Testimony**

Tiara Lambert, West's sister, testified that West and Ward have been in a relationship, and she referred to Ward as her brother-in-law. From January 2021 through February 2022, Tiara lived in the Texas home with West and Ward, although Ward mostly worked and lived in California. Tiara testified that she heard Ward and West refer to each other as husband and wife. Tiara also heard Ward refer to West as his wife to multiple people in the Texas community. Tiara did not know the date of their marriage. Tiara testified that West ordered a jacket that said "Mrs. Ward[,]"

and that West's testimony that Ward gave her the jacket would be false. Tiara later testified that Ward said he would get West the jacket.

The jury received the following instructions regarding the existence of informal marriage:

> Two people are married if they agreed to be married and after the agreement they lived together in Texas as spouses and there represented to others they were married.

> Isolated references to each other as husband and wife, without more, are insufficient to establish that JIMMIE WARD and CRISTY WEST each represented to others that they were married. Whether JIMMIE WARD and CRISTY WEST had a reputation in the community for being married to one another is a significant factor in your determination of whether JIMMIE WARD and CRISTY WEST each represented to others that they were married.

The jury answered "No" to Question 1, which asked, "[a]re JIMMIE WARD and CRISTY WEST married?" The trial court signed a Final Judgment Denying Informal Marriage, accepted the jury's verdict, entered an order that West and Ward are not married, informally or otherwise, and stated that West take nothing on her claim about the existence of an informal marriage. West filed a Motion for New Trial arguing, among other things, that she was entitled to a new trial because: the trial court abused its discretion by denying her objection to the jury charge's instruction regarding isolated references and reputation in the community; the evidence is legally and factually insufficient to support the trial court's judgment; and based on newly discovered evidence. Ward filed a Response, arguing that West's grounds do

18

not justify setting aside the jury's verdict. The trial court denied West's Motion for New Trial.

## ANALYSIS

### *Sufficiency of the Evidence*

We address West's third issue first because in issue three West complains that the evidence was legally and factually insufficient to support the jury's finding that there was no informal marriage. *See* Tex. R App. P. 47.1. West contends she established as a matter of law each element of a common law marriage and that the jury's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

"When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Franci*s, 46 S.W.3d 237, 241 (Tex. 2001) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)). When reviewing for legal sufficiency, we consider the evidence "in the light most favorable to the verdict, and indulge every reasonable inference that would support" the challenged finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit evidence that favors the finding, if a reasonable factfinder could, and we disregard evidence contrary to the challenged finding unless a reasonable factfinder could not disregard it. *See id.* at

19

827. "But if the evidence allows of only one inference," we may not disregard the evidence when deciding whether legally sufficient evidence supports the challenged finding. *Id.* at 822.

When a party attacks the factual sufficiency of the evidence on an issue on which she had the burden of proof, she "must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242. In a factual sufficiency review, we examine all the evidence and view it in a neutral light. *See id.* We cannot set the finding aside unless the evidence is so weak or so against the great weight and preponderance of the evidence that the trial court's finding is clearly wrong and unjust. *Id.*

The jury is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury may believe one witness, disbelieve another and resolve inconsistencies in any witness' testimony. *City of Keller*, 168 S.W.3d at 819. A reviewing court may not impose its own opinion to the contrary. *Id.*; *Golden Eagle*, 116 S.W.3d at 761.

An informal marriage may be proven by evidence the couple agreed to be married, and, after the agreement, they lived together in this state as spouses and represented to others in this state that they were married. *See* Tex. Fam. Code Ann. § 2.401(a). An agreement to be informally married may be established by direct or

20

circumstantial evidence. *See id.* § 2.401(a)(2); *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). Evidence of cohabitation and holding out the other party as one's spouse may constitute some evidence of an agreement to be married depending on the facts of the case. *Assoun v. Gustafson*, 493 S.W.3d 156, 160 (Tex. App.—Dallas 2016, pet. denied). Because in modern society it is difficult to infer an agreement to be married from cohabitation, evidence of "holding out" must be particularly convincing to be probative of such an agreement. *Id.* Holding out requires more than occasional references to each other as "wife" or "husband." *Smith v. Deneve*, 285 S.W.3d 904, 910 (Tex. App.—Dallas 2009, no pet.). A couple's reputation in the community as being married is a significant factor in determining the holding out element. *Id.*

We begin with the element of agreement to be married. To establish an agreement to be married, the evidence must show the parties intended to have a "present, immediate, and permanent marital relationship" and specifically agreed to be married. *Small v. McMaster*, 352 S.W.3d 280, 283 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Concerning evidence of their agreement to be married, West testified that she presented direct and circumstantial evidence of an agreement to be married. The evidence at trial cited by West as constituting an agreement to be married includes:

- Ward asked her father for her hand in marriage, proposed marriage, and gave her a ring.

- Ward admitted that West accepted his proposal.

- Ward hired an attorney to draft a prenuptial agreement.

- Ward testified that he intended to marry her to produce a child.

- West told Ward he must marry her before they have a child.

- Ward obtained a vasectomy reversal, paid for the IVF treatment, and West had a child in March 2022.

- An agreement to marry was formed by Ward accepting West's proposal that to conceive a child they must marry.

We hold the evidence West points to that allegedly shows an agreement to be married is not conclusive and it conflicts with evidence in the record that Ward did not agree to be married, including:

- Text messages between the parties included statements of being engaged, having a wedding, and being single after West's alleged date of marriage of July 25, 2020.

- Verni's testimony that she did not believe the parties were married.

- Ward's testimony denying the marriage.

- West's testimony that she was unsure if they were married.

- West's text messages with Ward failed to reference a marriage until after litigation began.

The evidence is conflicting as to whether West and Ward agreed to be married. Typically, when evidence of an informal marriage is conflicting, it is the jury's role to resolve the inconsistencies because the existence of an informal marriage is a fact

22

question. *See Small*, 352 S.W.3d at 282. The jury as factfinder determines the credibility of the witnesses and the weight to be given their testimony, which we do not disturb on appeal. *See City of Keller*, 168 S.W.3d at 819; *Golden Eagle Archery*, 116 S.W.3d at 761. Here, the evidence that West points to as constituting some evidence of an agreement to be married is not sufficiently convincing to be probative of such an agreement. *See Assoun*, 493 S.W.3d at 160. While West contends that she established an agreement to marry, which may be implied, arising from the facts and conduct of the parties, an implication of a marriage contract cannot be drawn where there is direct evidence that the requisite agreement to be married was never reached by the parties. *See id.* (citations omitted).

Based on this record, we conclude that West failed to establish as a matter of law that she and Ward agreed to be married. *See* Tex. Fam. Code Ann. § 2.401(a); *Dow Chem. Co.*, 46 S.W.3d at 241. Having determined the evidence is legally sufficient to support the jury's finding of no informal marriage because there was no agreement to be married, we need not address the evidentiary sufficiency of the remaining elements of informal marriage. *See* Tex. R. App. P. 47.1.

Assuming without deciding that West preserved her factual sufficiency complaint, we further conclude, based upon the evidence discussed infra, that the jury's finding of no informal marriage is not so contrary to the overwhelming weight

23

of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242. We overrule issue three.

*Motion for New Trial*

In issue one, West complains the trial court abused its discretion by denying her motion for new trial based on newly discovered evidence that Ward tampered with a material witness. West argues that KeAira Gamble, the wedding planner, was scheduled and prepared to testify and that her reasons for declining to testify–being too frightened after being threatened by Ward–were revealed for the first time after the trial. West included her and Gamble's affidavits in support of her motion and maintained that her failure to discover the new evidence sooner was not for want of due diligence. West contends that Gamble was expressly listed in the parties' discovery responses and witness lists. West argues that she expected Gamble to appear and testify that the parties were already married, and that the celebration Gamble was planning was to celebrate their nuptials with friends and family. West maintains that Gamble's testimony was not cumulative because it would have confirmed the parties were married when they planned their celebration and shown that their public representations were not isolated references. West also argues that Verni's testimony that Ward tried to bribe her in exchange for false testimony that he never referred to West as his wife, shows that Ward tried to tamper with two material witnesses, and that his misconduct was harmful error.

24

We apply an abuse-of-discretion standard when reviewing a trial court's denial of a motion for new trial based on newly discovered evidence. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). Under this standard, we may not overrule the trial court's decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004). We indulge every reasonable presumption in favor of the trial court's failure to grant a new trial. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809-10 (Tex. 1983), *overruled in part on other grounds by Moritz v. Preiss*, 121 S.W.3d 715 (Tex. 2003).

The Texas Supreme Court has explained the requirements for granting a motion for new trial based on newly discovered evidence:

> A party seeking a new trial on grounds of newly discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since the trial, (2) its failure to discover the evidence sooner was not due to a lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably produce a different result if a new trial were granted.

*Waffle House, Inc.*, 313 S.W.3d at 813. A party's allegations alone will not be enough to obtain a new trial based on newly discovered evidence. Instead, the party must introduce admissible evidence at a hearing on the motion for new trial that establishes such essential facts as the party's lack of prior knowledge of the newly discovered evidence, the party's prior diligence toward discovering the evidence, and the nature of the newly discovered evidence. *Strong v. Strong*, 350 S.W.3d 759,

25

772 (Tex. App.—Dallas 2011, pet. denied). "In the absence of a hearing on the motion, nothing is preserved for appellate review." *Bell v. Showa Denko K.K.*, 899 S.W.2d 749, 757 (Tex. App.—Amarillo 1995, writ denied). A trial court does not abuse its discretion in denying a motion for new trial based on newly discovered evidence when the movant failed to introduce admissible relevant evidence during the hearing demonstrating the existence of the newly discovered evidence. *See Amigos Meat Distribs., L.P. v. Guzman*, 526 S.W.3d 511, 522 n.2 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Nor does a trial court abuse its discretion in denying a motion for new trial where the movant does not show her due diligence in trying to procure the evidence prior to trial. *See Lynd v. Wesley*, 705 S.W.2d 759, 762 (Tex. App.—Houston [14th Dist.] 1986, no writ).

The record shows the trial court conducted a hearing on West's motion for new trial, but the appellate record does not include a reporter's record from the hearing. That said, the evidence attached to West's motion for new trial does not establish: that West lacked prior knowledge of Gamble's testimony; that her failure to discover the evidence sooner was not due to her lack of diligence; and that the evidence was not otherwise cumulative. *See Waffle House, Inc.*, 313 S.W.3d at 813.

The evidence West offered with her motion for new trial consisted of affidavits from West and Gamble. On the first day of trial, West's counsel made an oral pretrial motion and informed the trial court that they were surprised that one of

their "timely disclosed" witnesses (Gamble) had travel issues and asked if the trial court would allow the witness to appear by Zoom if she was unable to appear. The trial court explained that typically it only allowed testimony by Zoom in extreme circumstances and when a motion had been approved. After West's counsel stated that he did not know enough about the witness "to even argue it[,]" the trial court ruled that "at this point in time that's not what I'm inclined to do."

On the third day of trial, West's counsel again made an oral motion asking the trial court to allow Gamble to testify via Zoom because she had a sick child. West's counsel explained that Gamble was on both parties' witness lists and was referenced a lot in the text messages. Ward's counsel opposed the motion and stated that Gamble was not on West's witness list. The trial court denied West's oral motion, stating that a motion should have been filed seven days prior to trial and that West should have taken Gamble's deposition in advance.

While West argues she did not receive the evidence until after the trial began, the record shows West knew about Gamble prior to trial because Ward included her in his pretrial disclosures, but West did not take sufficient steps to present Gamble's testimony and West did not include Gamble on her witness list. Again, the trial court noted that West should have filed a motion prior to trial or taken Gamble's deposition. The record shows West's lack of diligence includes failing to list Gamble on her witness list, arrange for Gamble to be present, take Gamble's deposition, and

comply with the trial court's procedure for remote testimony. Based on this record, the trial court could have reasonably concluded that West knew about Gamble's testimony prior to trial and that West's failure to present Gamble's testimony was due to her lack of diligence, and the trial court could have reasonably concluded Gamble's testimony was cumulative of Verni's testimony. We conclude the trial court did not abuse its discretion by denying West's motion for new trial. We overrule issue one.

*Jury Charge*

In issue two, West complains the trial court abused its discretion by overruling her objection to a "superfluous" instruction in the jury charge regarding "isolated references" to each other as husband and wife. West argues the extra instruction, which is not in the Texas Pattern Jury Charge, was an impermissible comment on the weight of the evidence and did not assist the jury. West agrees that the instruction is a correct statement of the law but argues it should not be included in the jury charge because it gives undue weight to the "holding out" element of an informal marriage.

A trial court has considerable discretion to determine proper jury instructions, and we review a trial court's decision to submit a particular instruction for an abuse of discretion. *Gunn v. McCoy*, 554 S.W.3d 645, 675 (Tex. 2018) (citation omitted). We will not reverse a judgment for a charge error unless the error was harmful and

28

"'probably caused the rendition of an improper judgment' or 'probably prevented the petitioner from properly presenting the case to the appellate courts.'" *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (quoting Tex. R. App. P. 44.1(a)). Generally, charge error is harmful when it relates to a contested, critical issue. *Id.* (citation omitted).

A jury charge should track the applicable statutory language as closely as possible, and the trial court should not burden the jury with surplus instructions. *See Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 601 (Tex. 2010); *Grumbles v. Ineos USA, LLC*, No. 13-18-00316-CV, 2019 WL 2622339, at *4 (Tex. App.—Corpus Christi-Edinburg June 27, 2019, pet. denied) (mem. op.). A proper jury instruction assists the jury, accurately states the applicable law, and is supported by both the pleadings and evidence. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009). The trial court shall submit instructions "as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277.

That said, not every correct statement of law belongs in the jury charge. *State v. Luby's Fuddruckers Rests., LLC*, 531 S.W.3d 810, 820 (Tex. App.—Corpus Christi-Edinburg 2017, no pet.); *GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 291-92 (Tex. App.—Houston [1st Dist.] 1997, writ denied). A trial court's charge shall not directly comment on the weight of the evidence, but a charge is not objectionable on the ground that it incidentally

29

constitutes a comment on the weight of the evidence when it is properly part of an instruction. Tex. R. Civ. P. 277. A jury instruction impermissibly comments on the weight of the evidence when it encourages the jury to give undue weight to certain evidence. *Luby's Fuddruckers Rests., LLC*, 531 S.W.3d at 820.

A trial court does not abuse its discretion when it bases its instruction on the Texas Pattern Jury Charge for informal marriage which restates the statutory elements from the Family Code. *Estate of Curry*, Nos. 10-23-00207-CV, 10-23-00208-CV, 2025 WL 2473024, at *2 (Tex App.—Waco Aug. 28, 2025, no pet.) (mem. op.); *see* State Bar of Tex., Texas Pattern Jury Charges: Family & Probate PJC 201.4B (2024); *see also* Tex. Fam. Code Ann. § 2.401(a)(2). West objected to the second paragraph under instructions regarding existence of informal marriage which states:

> Isolated references to each other as husband and wife, without more, are insufficient to establish that JIMMIE WARD and CRISTY WEST each represented to others that they were married. Whether JIMMIE WARD and CRISTY WEST had a reputation in the community for being married to one another is a significant factor in your determination of whether JIMMIE WARD and CRISTY WEST each represented to others that they were married.

West argued the paragraph was not necessary to assist the jury and was not supported by the pleadings and evidence because there were no inconsistent or isolated references that West and Ward are husband and wife. West complained the instruction was an improper comment on the weight of the evidence which did not

30

include any controverting evidence on the issue of "holding out to others." West argued that the *Grumbles* case, which included the same language, did not apply because it included witnesses who testified about things communicated in the community that were inconsistent with holding out to others, and in this case, the jury was only considering evidence of communications between West and Ward and not evidence that the parties conveyed they were not married to others. *See Grumbles*, 2019 WL 2622339, at **1-5. The trial court overruled West's objection.

Given the evidence presented at trial, we conclude the instruction was proper to assist the jury in understanding the law. *See id.* at *5. The jury heard Verni testify that Ward introduced West as his wife, she told Ward she did not believe they were married, and she knew there was a wedding planned for April 2023. The jury also heard Tiara testify that Ward and West referred to each other as husband and wife, and that she heard Ward refer to West as his wife to multiple people in the Texas community, but she did not know their date of marriage.

The jury heard Ward testify that in July 2021, he proposed to West and told a few friends and family members he was engaged, and he acknowledged the July 2021 post on his Facebook account included a picture of West in the Lamborghini with the engagement ring and stated "[m]ade her my wife.[]" However, Ward denied making the July 2021 post and claimed West had accessed his social media and email accounts and changed things. Ward also testified that another Facebook post on his

31

account stating "[h]appy birthday to my wife[]" was inaccurate and had been edited. Ward acknowledged that he referred to West as his wife in a November 2021 text message with his security man, but he claimed it was to give the security man permission to enter his home while he was away.

The jury heard West testify that she and Ward married in July 2020, and that he gave her a ring in July 2021, but she denied he proposed. The same month West received the ring, she posted on Instagram from Jamaica and included the caption "Happy 29th birthday to my Husband[.]" The jury heard testimony that West alleged she and Ward married on July 25, 2020, and that she did not text, email, or post anything about getting married on that day. The jury also heard testimony that West did not text or email anyone about being married prior to October 2022, when Ward told her he was not getting married.

Given the evidence presented at trial, we hold the instruction was proper to assist the jury in understanding the law. *See id.* at *5. The instruction was not an improper comment on the weight of the evidence nor did the instruction mislead the jury. It was an accurate statement of the law as applicable to the facts of the case. *See id.* Given the trial court's considerable discretion in determining proper jury instructions, we conclude the trial court did not abuse its discretion by including the instruction. *See Gunn*, 554 S.W.3d at 675. We overrule issue two.

## CONCLUSION

Having overruled all of West's issues, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on October 21, 2025
Opinion Delivered January 29, 2026

Before Golemon, C.J., Johnson and Wright, JJ.